UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 1:10 CR 150 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| JAMES HAZELWOOD, *et al.*, | ) | |
| | ) | |
| Defendants | ) | ORDER |

Defendant James Hazelwood ("Hazelwood"), along with eleven other defendants, are charged with various offenses arising out of a purported Internet-based drug trafficking organization. Currently pending before the court are Defendant Hazelwood's Motion to Dismiss the Indictment (ECF No. 223), joined in by the following co-defendants: Audrey Barbara Rovedo ("Barbara-Rovedo"), Julie Toennies ("Toennies"), Bruce Liddy ("Liddy"), and Dora Fernandez-Montalvo ("Fernandez-Montalvo"); Defendant Vinesh Darji's ("Darji") Motion to Dismiss the Indictment for Violation of the Due Process Clause of the Fifth Amendment (ECF No. 270), joined in by Stephen Derks ("Derks") and Terence Sasaki ("Sasaki"); Defendant Darji's Motion to Dismiss Indictment for Failure to Properly Allege Knowledge Element (ECF No. 255), joined in by Jennifer Ryan ("Ryan"), Hazelwood, Liddy, Derks, and Sasaki; Defendant Ryan's Motion to Dismiss Indictment (ECF No. 256), joined in by Derks, Sasaki, and Helen Kann ("Kann"); Defendant Barbara-Rovedo's Motion to Dismiss (ECF No. 236), joined in by Hazelwood, Darji, Liddy, and Sasaki; Defendant

Hazelwood's Motion for the Pretrial Disclosure of Specified *Brady* Material (ECF No. 249), joined in by Darji, Ryan, Kann, and Sasaki; Defendant Hazelwood's Motion for Reconsideration (ECF No. 233); Defendant Hazelwood's Motion for Limited Disclosure of Grand Jury Instructions (ECF No. 272), joined in by Sasaki; Defendant Darji's Motion for Production or in Camera Inspection of Grand Jury Minutes (ECF No. 262), joined in by Derks and Sasaki; Defendant Hazelwood's Motion to Strike Surplusage From the Indictment (ECF No. 209), joined in by Ryan, Toennies, Darji, Sasaki, Kann, Derks, and Fernandez-Montalvo; Defendant Darji's Motion to Compel Production of Rule 16 Discovery (ECF No. 259), joined in by Derks, Hazelwood, and Sasaki; and Hazelwood's Motion to Compel Return of Attorney Client Communications Intercepted Through Title III Intercept and to Compel Production of Discovery (ECF No. 151).[1]  For the reasons that follow, the court denies the following motions: Defendant Hazelwood's Motion to Dismiss the Indictment, Defendant Darji's Motion to Dismiss the Indictment for Violation of the Due Process Clause of the Fifth Amendment, Defendant Darji's Motion to Dismiss Indictment for Failure to Properly Allege Knowledge Element, Defendant Ryan's Motion to Dismiss Indictment, Defendant Barbara-Rovedo's Motion to Dismiss, Defendant Hazelwood's Motion for the Pretrial Disclosure of Specified *Brady* Material, Defendant Darji's Motion to Compel Production of Rule 16 Discovery, Defendant Hazelwood's Motion for Reconsideration, Defendant Hazelwood's Motion for Limited Disclosure of Grand Jury Instructions, and Defendant Darji's Motion for Production or in Camera Inspection of Grand Jury Minutes.  The court grants in part and denies in part the following motions: Defendant Hazelwood's Motion to Strike Surplusage From the Indictment and Defendant Hazelwood's Motion

---

[1]    For greater clarity as to which defendant filed which motion, and which Defendants joined in each motion, the court has attached, as Appendix A, a chart detailing this information.

to Compel Return of Attorney Client Communications Intercepted Through Title III Intercept and

to Compel Production of Discovery.

## I.  BACKGROUND

Defendants are charged with conduct allegedly occurring between October 2005 and February 2009.  The Indictment alleges the following thirty-seven counts: (1) conspiracy to distribute controlled substance (Count I); (2) conspiracy to commit money laundering (Count II); (3) distribution of Schedule III controlled substance based on prescriptions issued outside the usual course of professional medical practice and not for a legitimate medical purpose (Counts III-XXII); (4) distribution of Schedule IV controlled substance, based on prescriptions issued outside the usual course of professional medical practice and not for a legitimate medical purpose (Count XXIII); (5) money laundering (Counts XXIV-XXXVI); and (6) engaging in continuing criminal enterprise (Count XXXVII).

Defendant Hazelwood is charged with Counts 1-37; Toennies with Counts 1-23;  Barbara-Rovedo with Counts 1-23; Fernandez-Montalvo with Counts 1-18, 21, and 23; Sasaki with Counts 1 and 2; Darji with Counts 1, 3, 8, 10-11, 14-18, and 23; Liddy with Counts 1, 4, 6-7, 9, and 13; Kann with Counts 1, 3, 24-36; Ryan with Count 1; and Derks with Counts 1, 19, and 23. These charges stem from allegations that Hazelwood organized an internet "pill mill," whereby he allegedly marketed and sold Schedule III and IV prescription pills to online buyers outside the usual course of medical practice and not for a legitimate medical purpose with the help of doctors and pharmacists that he recruited to participate in the scheme.  The Government contends that Hazelwood made millions of dollars from this business and that he used offshore accounts and businesses to conceal these profits.

-3-

## II. MOTIONS TO DISMISS INDICTMENT

### A. Motion to Dismiss Standard

Rule 12(b) of the Federal Rules of Criminal Procedure provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." The court is permitted under Rule 12(b) to "make preliminary findings of fact necessary to decide questions of law presented by pre-trial motion so long as the court's findings on the motion do not invade the province of the ultimate fact finder." *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976). A defense is "'capable of determination' if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the offense." *United States v. Covington*, 395 U.S. 57, 60 (1969).

Defendants Hazelwood, Darji, Ryan, and Barbara-Rovedo filed Motions to Dismiss the Indictment. Defendants Hazelwood and Ryan's Motions to Dismiss the Indictment, and Darji's Motion to Dismiss the Indictment for Violation of Due Process Clause of the Fifth Amendment, raise some of the same grounds, and therefore these grounds will be collectively addressed. Hazelwood, Ryan, and Darji argue that the Indictment against them should be dismissed as a matter of law because their conduct did not constitute a violation of the Controlled Substances Act ("CSA") at the time of the alleged offense, and that under the principal of lenity, the CSA cannot be applied to the conduct alleged in the Indictment. Hazelwood, Ryan, and Darji also assert that Title 21 is unconstitutionally vague as applied to them, and therefore void for vagueness. In addition, Darji seeks dismissal based on his contention that this prosecution is based upon a novel legal theory. Hazelwood also contests the sufficiency of the Indictment.

-4-

Defendant Barbara-Rovedo seeks dismissal of the Indictment based on the Government's failure to obtain allegedly exculpatory files from a third party. Defendant Darji's second Motion to Dismiss seeks dismissal based on the Government's failure to properly allege the knowledge element. The court will address each of those arguments in turn below.

### B. Violation of the CSA

### 1. CSA

The CSA defines a "controlled substance" as a "drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter." 21 U.S.C. § 802(6). Section 841 of the CSA provides: "it shall be unlawful for any person knowingly or intentionally – (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance." 21 U.S.C. § 841. Section 846 criminalizes the conspiracy to violate § 841. 21 U.S.C. § 846. The CSA contains an exception to the broad prohibition on the distribution of controlled substances for prescriptions written by a practitioner, including a physician, licensed by law to administer such drugs. *See* 21 U.S.C. §§ 353(b), 802(21), 829(b). Pursuant to 21 C.F.R. § 1306.04(a), a controlled substance may only be prescribed and dispensed "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."

On October 15, 2008, Congress passed the Ryan Haight Online Pharmacy Consumer Protection Act of 2008 ("Ryan Haight Act"), 21 U.S.C. § 829(e), which became effective on April 15, 2009. The Ryan Haight Act states that "no controlled substance that is a prescription drug . . . may be delivered, distributed, or dispensed by means of the Internet without a valid prescription." *Id*. A "valid prescription" means that a prescription is issued for a "legitimate medical purpose in

the usual course of professional practice" by a practitioner who has conducted at least one in-person medical evaluation or a covering practitioner. *Id.*

## 2. Charges Against Defendants

Defendants argue that the Indictment against them should be dismissed as a matter of law because their conduct did not constitute a violation of the CSA at the time of the alleged offense. They assert that prior to the passage of the Ryan Haight Act, they could not be held criminally liable for issuing prescriptions for Schedule III and IV controlled substances, because there was no in-person encounter with the patient by the physician. Defendants further contend that the Government is seeking to criminalize all of the transactions based on its view that the Internet and telephone communications between the prescribing physician or representative and the patient did not establish a legitimate doctor-patient relationship. If the Government is challenging all of the prescriptions as illegal, Defendants contend, it has to be logically challenging the manner and means of conducting medicine by telephone and Internet. Since the Ryan Haight Act was not effective until April 13, 2009, Defendants argue that it was not illegal *per se* to use the Internet and telephone to prescribe and dispense Schedule III and IV controlled substances prior to that date. They maintain it was not until the Ryan Haight Act was passed that the CSA required an "in-person" medical evaluation. Since the conspiracy alleged by the Government was from October 2005 to February 2009, dates prior to the enactment of the Ryan Haight Act, Defendants assert that the transactions could not have been illegal. The only thing that could support the Government's view other than this Act, Defendants argue, is the Justice Department's April 2001 Guidance (66 FR 21181-01) about the requirements of a legitimate doctor-patient relationship. Defendants contend that *Gonzales v. Oregon*, 546 U.S. 243 (2006), demonstrates that the Attorney General has no authority to declare

-6-

conduct to be a criminal violation of the CSA, only Congress can do so. Additionally, Defendants assert that the Government's interpretation of the CSA prior to the passage of the Ryan Haight Act is not entitled to deference.

The Government argues that Defendants completely miss the point. They are not being prosecuted merely for selling controlled substances over the Internet. Instead, Defendants are being prosecuted for conspiring with medical professionals to distribute controlled substances outside the usual course of professional practice and without a legitimate medical purpose. (Resp. at 5-6, ECF No. 228.) Defendants are charged with numerous offenses, none of which require the use of a telephone or the Internet. The Government agrees that the Ryan Haight Act *is* inapplicable to Defendants in this case. However, it maintains that Defendants' conduct prior to the enactment of the Ryan Haight Act violated other well-established sections of the CSA. The Government asserts it is not attempting to create a *per se* rule that Internet prescriptions are invalid because they do not include a face-to-face meeting; it is prosecuting Defendants for participating in a conspiracy to prescribe drugs outside the usual scope of professional practice. *See United States v. Quinones*, 536 F. Supp.2d 267, 271 (E.D.N.Y. 2008) (finding the fact that the moving defendants allegedly carried out their activities through the Internet to be of no consequence). The fact that these transactions occurred over the Internet or by the telephone is irrelevant. The Indictment "seeks to prosecute individuals who conspired to commit actions violating the CSA by dispensing controlled substances without a 'legitimate medical purpose' and 'outside the course of the [physician's] practice.'" *United States v. Birbragher*, 576 F. Supp.2d 1000 (N.D. Iowa 2008).

The court finds the Government's arguments are well-taken. Courts have previously applied the CSA prior to the passage of the Ryan Haight Act to convict defendants involved in the illegal

distribution of controlled substances through the Internet under circumstances where drugs were not prescribed for a legitimate medical purpose. *See, e.g., United States v. Hernandez*, No. 07-60027-CR, 2007 WL 2915854, at *9 (S.D. Fla. Oct. 4, 2007); *United States v. Fuchs*, 467 F.3d 889, 905 (5th Cir. 2006); *United States v. Nelson*, 383 F.3d 1227 (10th Cir. 2004). The court concludes that the Indictment does not rely on the Ryan Haight Act as Defendants claim, and therefore is not defective on this ground. The court finds the reasoning of the cases previously applying the CSA to Internet conduct to prescription drugs that were dispensed over the Internet without a legitimate medical purpose in the course of professional practice to be persuasive. Therefore, whether or not conduct is outside the bounds of professional medical practice is a determination for the jury. *See Hernandez*, 2007 WL 2915854 at *8. Even though Congress passed legislation on Internet distribution of controlled substances without a face-to-face meeting, via the Ryan Haight Act, such activity may also fall under the "prohibition of distribution outside the usual scope of professional practice." *Quinones*, 536 F.Supp.2d at 273; *see also United States v. Lovin*, No. 07cr2016-IEG, 2008 WL 4492616 (S.D. Cal. Sept. 29, 2008) (same).

Further, Defendants also misread *Gonzales*. *Gonzales* does not demonstrate that Defendants' alleged conduct was legal. In *Gonzales*, the court was faced with the meaning of "legitimate medical purpose." The court had to determine whether an Interpretive Rule written by the Attorney General defining "legitimate medical purpose" should be afforded the deference given to agency interpretations under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-845 (1984), because the phrase is ambiguous. *Gonzales*, 546 U.S. at 258. The Attorney General stated in 66 Fed Reg 56608 that "assisted suicide is not a 'legitimate medical purpose' under § 1306.04, and dispensing controlled substances to assist suicide violates the CSA." *Id*. at 261

(internal citation omitted). The Indictment here does not attempt to classify an entire class of usage as an illegitimate medical purpose as the Attorney General had in *Gonzales*. Instead, the Indictment describes how the prescriptions were not legitimate because they were not issued for a legitimate medical purpose. They are not illegal because they are Internet prescriptions, but due to the fact that they were issued outside the usual scope of professional practice. *See Quinones*, 536 F.Supp.2d at 271. The exemptions to the CSA for legitimate prescriptions incorporate the requirement that the distribution or prescription be made in the "course of professional practice." As was true in *Quinones*, the Government here is "making no attempt, as in *Gonzales,* to unilaterally define which practices fall outside the scope; rather it intends to leave that question where it has been for over 30 years-with the jury." *Id*. Unlike the Attorney General's Interpretive Rule in *Gonzales*, which the government argued should be given deference, there is no argument by the Government in this case that is analogous. Instead, the Government relies on case law interpreting the CSA to support its position. Therefore, *Gonzales* does not provide Defendants with a basis for relief.

### 3. Application of CSA to Defendants

Defendants Hazelwood and Ryan argue that they cannot be held personally liable for violations of the CSA because prescriptions were legitimately dispensed, and even if they were not, they cannot be held liable, as only doctors and pharmacists are given exemptions to allow them to prescribe and dispense controlled substances. Thus, they maintain that they never personally issued or filled a single prescription, yet are being held liable for the professional judgment of others. Further, the Government cannot even contend that they directed the physicians to prescribe pain medications for all patients, as some patients were denied prescriptions.

The CSA states: "it shall be unlawful for any person knowingly or intentionally [to] . . . distribute . . . a controlled substance." 21 U.S.C. § 841.  In addition to finding registered physicians liable under § 841, the Supreme Court, in *United States v. Moore*, 423 U.S. 122, 131 (1975), held that the statute is not just applicable to physicians and pharmacists, but to "any person."  Therefore, the statute is applicable to "any persons" who violate its prohibitions.  Just because Hazelwood and Ryan do not fit within the categories for an exemption to prescribe or dispense controlled substances does not mean that they cannot be held liable for violations of the CSA.  *See United States v. Johnson*, 831 F.2d 124, 128 (6th Cir. 1987).  Numerous courts have rejected arguments by defendants claiming that as nonphysician or pharmacist, he/she could not violate § 841.  *See, e.g.,*

> *United States v. Mahar*, 801 F.2d 1477, 1480, 1487 (6th Cir.1986) (rejecting challenge to the sufficiency of the evidence to convict medical clinic owner/president/manager under CSA for drug conspiracy); *Vamos*, 797 F.2d at 1148, 1151-54 (affirming nurse/office manager's conviction for aiding and abetting the distribution of controlled substances outside the scope of professional medical practice under the CSA); *United States v. Albert*, 675 F.2d 712, 715-16 (5th Cir.1982) (rejecting physician's argument that his conviction for conspiracy to dispense controlled substances in violation of the CSA should be reversed because his coconspirators were nonphysicians); *United States v. Hicks*, 529 F.2d 841, 844 (5th Cir.1976) (per curiam) (rejecting security guard's argument that, as a matter of law, he was exempt from prosecution under § 841 because as a nonphysician he was legally incapable of dispensing); *United States v. Green*, 511 F.2d 1062, 1070-71 (7th Cir.1975) (rejecting challenge of the defendant, owner of a building that housed a medical center and pharmacy involved in prescription sales operation, to the sufficiency of the evidence supporting his conviction for conspiracy with physician and pharmacist to violate § 841(a)); *United States v. Prejean*, 429 F.Supp.2d 782, 787, 804 (E.D.La.2006) (rejecting argument of defendant, the owner of three pain management clinics

-10-

> and two pharmacies, that indictment should be dismissed because it
> failed to state a violation of § 841 because the statute could not be
> applied to nonphysician/nonregistrant); *United States v. Lovin,* No.
> 07cr2016-IEG, 2008 WL 4492616, at *4 (S.D.Cal. Sept.29, 2008)
> (unpublished) ( "Courts have upheld convictions of non-practitioners
> for conspiring to distribute, or aiding and abetting the distribution of
> controlled substances based upon prescriptions issued outside the
> course of medical practice.").

*United States v. Birbragher*, 603 F.3d 478, 486-87 (8th Cir. 2010). Therefore, it is well-settled that

parties other than doctors and pharmacists may be held liable under § 841. Accordingly, the CSA

applies to Hazelwood in his position as a "businessman [who] ran Internet websites where patients

could obtain prescriptions from a licensed physician," (Hazelwood Mot. at 19) and Ryan in her

position as a "telemarketer" (Ryan Mot. at 15), both involved in an alleged conspiracy with doctors

and pharmacists to distribute controlled substances outside the course of their professional practice.

Therefore, the court denies Defendants' Motions on this basis.

### C. Lenity and Application of the CSA

Defendants contend that under the principal of lenity, the CSA cannot be applied to the

conduct alleged in the Indictment. The rule of lenity applies where there is ambiguity regarding the

scope of conduct made criminal and courts should resolve ambiguity in the statutes in the favor of

defendants. *See Crandon v. U.S.,* 494 U.S. 152, 158 (1990); *Tanner v. United States*, 483 U.S. 107

(1987). Hazelwood claims that there is "undeniable ambiguity as to what is necessary for a

legitimate doctor-patient relationship and thus a valid prescription must be resolved in this

Defendant's favor. Until the passage of the Ryan Haight Act, not only was the law unclear but

Congress knew the law was unclear." (Mot. at 16.) Hazelwood and Ryan maintain that "when

there are two rational readings of a criminal statute, one harsher than the other, we are to choose the

harsher only when Congress has spoken in clear and definite language."  (Hazelwood Mot. at 15

(quoting *McNally v. United States*, 483 U.S. 350, 360 (1987), *superceded by statute*, 18 U.S.C. §

1346 *as recognized in Skilling v. United States*, 130 S.Ct. 2896 (2010)); Ryan Mot. at 12.)

Defendants, though, fail to present a conflict in the interpretation of the CSA, similar to that

which existed in *McNally* regarding the mail fraud statute.  There, the defendants were charged with

violating the mail fraud statute by devising a scheme to defraud the Commonwealth of Kentucky's

citizens and government of their intangible right to have the Commonwealth's affairs conducted

honestly.  The court held that the mail fraud statute clearly protects property rights, but does not

refer to the intangible right of the citizenry to a good government.  *McNally*, 483 U.S. at 356.  The

court applied the rule of lenity and held that the mail fraud statute is limited in scope to the

protection of property rights, and if Congress meant to penalize additional conduct, it must do so

more clearly.  *Id*. at 359-60.  Here, Defendants' only interpretation is that there is substantial doubt

as to whether their conduct was illegal under the CSA, and therefore the doubt has to be resolved

in their favor, because of the rule of lenity.  However, as the Supreme Court stated, in *Smith v.

United States*, 508 U.S. 223, 239 (1993), "[t]he mere possibility of articulating a narrower

construction [] does not by itself make the rule of lenity applicable."  Therefore, the court finds the

alleged criminal conduct of Defendants falls well within a reasonable interpretation of the CSA.

As the court in *Quinones* stated:

> [A] reasonable person reading § 841(a)(1) is on notice that distributing
> controlled substances is illegal unless it fits within the exception; it is
> not too great a burden to require that person to investigate the extent
> of the exception before plunging ahead.  Put another way, it is
> disingenuous that the moving defendants seek to invoke the exception
> as legalizing their actions, but then claim they do not know what the
> exception means.

536 F. Supp.2d at 274. The court agrees with the *Quinones* court. It would be unfair if Defendants were allowed to claim that the online pharmacy did not violate the CSA because its prescriptions fall within an exception, while later claiming that they were unable to understand what "prescription" meant under the CSA. Furthermore, it is for the jury to decide whether or not Defendants' conduct falls within the scope of the offenses charged. The rule of lenity's purpose is not to bypass the jury. Therefore, the court denies Defendants' Motions on this basis also.

### D. Vagueness

Defendants contend that Title 21 is unconstitutional as applied to them because prior to the passage of the Ryan Haight Act, the statutory scheme did not clearly define the alleged conduct as criminal and is thus void for vagueness. Title 21 proscribes the unlawful distribution of controlled substances. Prior to passage of the Ryan Haight Act, Defendants assert that Congress did not provide any standard to invalidate a prescription and render a transaction a felony. Defendants claim that the Supreme Court has found the phrase "legitimate medical practice" to be ambiguous in *Gonzales*, 54 U.S. at 258, in the context of when the Attorney General sought to make an argument in regard to assisted suicide. They maintain that this is the kind of "standardless" law that allows for arbitrary prosecutions. (Hazelwood Mot. at 18; Ryan Mot. at 14.) Defendants argue that through the passage of the Ryan Haight Act, Congress recognized the need to clarify what a valid prescription was, and prior to its passage, the CSA lacked explicit standards to assist law enforcement in determining what was a valid prescription. Defendants contend that the unfairness of this prosecution can especially be seen by the fact that Defendants attempted to change their business model to conform to new requirements. To be clear, Defendants state that although they are asserting the CSA is void for vagueness as applied to them, they are not saying that the statute

-13-

could never be constitutionally used to prosecute a sale of narcotics pursuant to a prescription. Unlike cases where physicians and pharmacists are charged, Defendants maintain that they did not knowingly choose to issue prescriptions or dispense narcotics to known drug abusers. Hazelwood claims to be just a businessman who ran Internet websites from which patients could obtain prescriptions from a licensed physician after review of a patient questionnaire and often a telephone conference. Ryan contends she was just a telemarketer who solicited pharmacies to fill orders originated from Internet websites where patients could obtain prescriptions from a licensed physician after a review of a patient questionnaire and often a telephone conference. In order for them to be held liable, Defendants contend, Congress needed to have acted prior to the alleged conduct that occurred in this case. They maintain that the passage of the Ryan Haight Act demonstrates the ambiguity of the law, and that Congress understood it to be ambiguous prior to the passage of the Act.

As the Sixth Circuit has explained, "[t]he standard for vagueness in a criminal statute is if it defines an offense in such a way that ordinary people cannot understand what is prohibited or if it encourages arbitrary or discriminatory enforcement." *United States v. Avant*, 907 F.2d 623, 625 (6th Cir.1990) (citing *Kolender v. Lawson*, 461 U.S. 352, 355 (1983)). However, it is well-established that "vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Powell*, 423 U.S. 87, 92 (1975) (citing *United States v. Mazurie*, 419 U.S. 544, 550 (1975)). Defendants do not assert that the CSA, or their indictment for violation thereof, involved their First Amendment rights. Therefore, each Defendant must establish that "the statute is vague as applied to his particular case,

not merely that the statute could be construed as vague in some hypothetical situation." *United States v. Krumrei*, 258 F.3d 535, 537 (6th Cir. 2001) (citing *Avant*, 907 F.2d at 625).

Section 841(a)(1) of the CSA provides a broad prohibition of the distribution of controlled substances. Sections 353(b), 802(21), and 829(b) of the CSA provide exceptions to this broad prohibition for physicians. Section 1306.04(a) of the CSA states that a controlled substance may only be prescribed and dispensed for a "legitimate medical purpose by an individual acting in the usual course of his professional practice." The provisions of the CSA at issue here, and the relevant regulation, are "sufficiently clear that the speculative danger of arbitrary enforcement does not render it void for vagueness." *See Birbragher*, 603 F.3d at 489; *see also United States v. DeBoer*, 966 F.2d 1066, 1068-69 (6th Cir. 1992) (finding conduct proscribed in § 841(a)(1) was not void-for-vagueness since § 841(a)(1) and 21 C.F.R. § 1306.04(a) "clearly defines the pharmacist's responsibilities that give rise to conduct that constitutes unlawful distribution of a prescription drug); *Quinones* 536 F. Supp.2d at 274 (concluding that phrase "usual scope of professional practice" not unconstitutionally vague). The *Birbragher* court stated that "[a] reasonable person reading § 841(a)(1) is on notice that distributing controlled substances violates the CSA unless such a distribution fits within an exception. Such a person is also on notice that the 'prescription exception' of § 1306.04 does not apply to 'prescriptions' issued and/or filled outside the usual course of professional practice." 603 F.3d at 488. Defendants have not cited to any authority to demonstrate that the CSA or 21 C.F.R. § 1306.04 fails to provide adequate notice regarding what conduct is prohibited by the statute.

Therefore, the Indictment clearly describes prohibited conduct, i.e. the dispensing and/or distribution of controlled substances without a valid prescription. If Defendants are taking issue

-15-

with the lack of definition for a valid prescription, their argument is misdirected.  Their offending actions were the distribution of controlled substances, not the prescriptions.  Defendants have not met the standard for striking down the statute as void for vagueness: that there be such a breadth to the language of the statute that no ordinary person would understand which actions were legal and which were not. Therefore, their void for vagueness arguments on this basis must fail.

Defendants contend that the court in *Gonzales* described the phrase "legitimate medical purpose" as a "generality, susceptible to more precise definition, and open to varying constructions," which supports their argument that the statute contained ambiguous language. (Mot. at 17 (quoting *Gonzales*, 546 U.S. at 258).)  Defendants have correctly stated the *Gonzales* court's description of the phrase.  However, the court described the phrase in this manner in the context of discussing administrative rulemaking powers, not to determine whether the phrase was unconstitutionally vague.  As the court stated in *Hernandez*, "[t]he *Gonzales* Court expressed no dissatisfaction with the language of § 1306.04(a), other than to note that it shed no light upon the issue to be decided."  2007 WL 2915854 at *11.  This court finds the reasoning of *Hernandez* to be persuasive.  Therefore, Defendants' Motions on this ground are hereby denied.

Defendants Ryan and Hazelwood also question the applicability of the CSA to them, since they are neither a doctor nor a pharmacist, and did not know what conduct was prohibited. Defendants in *Quinones* made a similar argument as Hazelwood and Ryan, regarding the ability to be held liable as a lay person, who unlike doctors, pharmacists, and other professionals, "cannot be charged with knowledge of what constitutes the 'usual course of professional practice.'" 536 F. Supp.2d at 274.  Hazelwood and Ryan, like the defendants in *Quinones*, cite no persuasive authority for this argument.  Courts have previously "upheld convictions of non-practitioners for conspiring

-16-

to distribute, or aiding and abetting the distribution of controlled substances based upon prescriptions issued outside the course of medial practice." *Lovin*, 2008 WL 4492616 at *4 (citing *United States v. Green*, 511 F.2d 1062, 1070-71 (7th Cir.1975) (upholding conviction of owner of building that housed medical center and pharmacy based upon evidence defendant was fully aware the medical clinic and pharmacy were operating in a manner which was not medically justified); *United States v. Hicks*, 529 F.2d 841, 844 (5th Cir.1976) (finding security guard with 4th grade education could be convicted under § 841(a)(1) because "[i]t was not necessary that Hicks personally 'dispense' only that he knowingly participated in a conspiracy . . . to dispense controlled substances in violation of 21 U.S.C. § 841(a)(1)); *United States v. Mahar*, 801 F.2d 1477, 1487 (6th Cir.1986) (pharmacy manager); *United States v. Vamos*, 797 F.2d 1146, 1153 (2d Cir.1986) (nurse/office manager)).  As the *Quinones* court stated, "a statute is not required to specify every prohibited act."  *Quinones*, 536 F.Supp.2d at 274 (internal citations omitted).  Therefore, Hazelwood and Ryan did have notice that operating a website that engages in the type of activities alleged here could result in criminal liability.  Section 841(a)

> creates a sweeping prohibition on distribution of controlled substances, subject to a relatively narrow exception for distribution within the usual scope of professional practice.  That latter phrase has an objective meaning that prevents arbitrary prosecution and conviction: Neither the government nor the jury is free to impose its own subjective views about what is and is not appropriate; rather, the government is obliged to prove, and the jury constrained to determine, what the medical profession would generally do in the circumstances.

*Id*. at 274.  In addition, it was not necessary for Hazelwood and Ryan to personally dispense or prescribe the drugs, only that they knowingly participate in a conspiracy with their co-defendants, or aid and abet co-defendants in dispensing controlled substances in violation of 21 U.S.C. §

841(a)(1).  *See Hicks*, 529 F.2d at 844.  Furthermore, despite Hazelwood and Ryan's assertion that he did not knowingly choose to issue prescriptions or dispense narcotics to known drug abusers, there has been no case decided under § 841 imposing a requirement that the Government prove that the individuals who received prescribed drugs were addicts or drug abusers.  *See Hernandez*, 2007 WL 2915854 at *10.

As stated above, it is not too great a burden for a person to investigate the extent of the exception before pursuing business ventures in reliance upon it.  The court finds the phrases "legitimate medical purpose" and "in the usual course of professional practice" are not so vague as to deprive Defendants of fair warning that their alleged conduct was illegal. The court, in *Lovin* stated:

> [c]ourts have consistently rejected the argument that the phrases contained in 21 C.F.R. § 1306.04, defining how prescriptions are to be issued, are unconstitutionally vague.  *United States v. Rosenberg,* 515 F.2d 190, 197-98 (9th Cir.1974) (noting the phrase had been used in statutes since 1914 and courts had shown "ease and consistency" in interpreting the phrase); *United States v. Collier,* 478 F.2d 268, 272 (5th Cir.1973) ("in the usual course of professional practice" language not unconstitutionally vague); *United States v. DeBoer,* 966 F.2d 1066, 1068-69 (6th Cir.1992) (language of § 841(a)(1) is not void for vagueness because it clearly defines a pharmacist's responsibilities); *United States v. Prejean,* 429 F.Supp.2d 782, 805 (E.D.La.2006) (rejecting defendants' argument that a lack of consensus among the medical community regarding what is considered "legitimate medical purpose" rendered statute and regulation void for vagueness); *United States v. Quinones,* 536 F.Supp.2d 267, 274 (E.D.N.Y.2008) (rejecting void for vagueness argument made by operators of nearly identical internet pharmaceutical operation).

2008 WL 4492616 at *4. Therefore, the court does not find the statute to be void for vagueness.

### E. Sufficiency of Indictment

Hazelwood argues for the first time, in his Reply to his Motion to Dismiss Indictment, that

the Indictment is insufficient as a matter of law because it fails to appraise Hazelwood of specific conduct that he engaged in to trigger the charges set forth against him in Counts 3-23 of the Indictment. Counts 3-22 are distributions of a Schedule III substance, based on prescriptions issued outside the usual course of professional medical practice and not for a legitimate medical purpose. Count 23 is distribution of a Schedule IV substance, based on prescriptions issued outside the usual course of professional medical practice and not for a legitimate medical purpose.  Hazelwood argues that, under *United States v. Anderson*, 605 F.3d 404, 411 (6th Cir. 2010), for an indictment to be sufficient, the specific event triggering the offenses charged against the defendant must be stated.

An indictment properly charges a criminal offense if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *Anderson*, 605 F.3d at 411.  An indictment can meet the first requirement by articulating the offense with the words of the statute. *Hamling*, 418 U.S. at 118.  The words also must "fully, directly, and expressly, without any uncertainty or ambiguity, set forth the elements necessary to constitute the offense intended to be punished." *Id.* (internal citation omitted).  This requires the description of the offense to be accompanied by a statement of facts that will inform the defendant of the specific offense with which he is charged. *Id.* (internal citation omitted).  The Indictment in this case meets both of these criteria, providing in detail within its 147 pages, the offenses charged along with the language of each of the respective statutes and specific instances of conduct, the dates, and other identifying information, that informs Hazelwood of each charge against him.  The Indictment states for Counts 3-22 each of the Defendants named, the order date, delivery date, hydrocodone quantity, and the supplied customer.  Count 23 states the

approximate dates Hazelwood distributed a schedule IV substance, the amount dispensed, and that it occurred in the Northern District of Ohio, Eastern Division and elsewhere. Therefore, the Indictment properly charges Hazelwood of the offenses stated therein and he has the specific events triggering the charges against him.

Hazelwood also claims the Government is continually shifting its theory of the case, depending on his arguments. He asserts that the Government claimed at one time that Hazelwood was being prosecuted only regarding specific prescriptions detailed in Counts 3-23, and at another time indicated he was being prosecuted for the thousands of prescriptions as set forth elsewhere in the Indictment. Hazelwood argues that if the Government's theory is that all the prescriptions were illegal, then the Indictment has to be insufficient under *Anderson*. However, Hazelwood mischaracterizes the Government's arguments. The Government is alleging that each of the prescriptions set forth in Counts 3-22 were illegal and that the thousands of prescriptions alleged to be part of the conspiracy were also illegal. Hazelwood is not just charged with the prescriptions at issue in the controlled buys within Counts 3-22, but also the prescriptions issued as part of the conspiracy. Therefore, these arguments are not inconsistent, and the Indictment should not be dismissed on this ground.[2]

### F. Novel Theory of Prosecution

Defendant Darji argues that the Indictment must be dismissed because the criminal charges filed against Defendants are based upon a novel theory of prosecution, which is prohibited by the Due Process Clause of the Fifth Amendment. (Darji Mot. at 23, ECF No. 270). Darji contends that

---

[2] Additionally, Hazelwood's citations to a variance and a constructive amendment are premature given that even if the Government had shifting legal theories, neither a variance nor a constructive amendment would be applicable until trial.

"the legality of pharmacists filling Internet prescriptions was unsettled on the dates of the charges listed in the Indictment, and the law remained in an ambiguous state until April 13, 2009, the date the Ryan Haight Act went into effect."  (*Id*.)  However, as detailed above, several courts have already applied the CSA to the sales of controlled substances over the Internet prior to the passage of the Ryan Haight Act, and determined that the law was not ambiguous.  The Indictment alleges a violation of the CSA, distribution of a controlled substance, without a valid prescription.  Therefore, as the law was neither unsettled nor ambiguous on the dates of the charges listed in the Indictment, the theory of prosecution is not novel.  Accordingly, Darji's Motion is denied on this ground.

For the foregoing reasons, the court denies Defendant Hazelwood's Motion for Dismissal of the Indictment (ECF No. 223), Defendant Ryan's Motion to Dismiss the Indictment (ECF No. 256), and Defendant Darji's Motion to Dismiss the Indictment (ECF No. 270).

### G.  Barbara-Rovedo's Motion to Dismiss Indictment

Defendant Barbara-Rovedo seeks dismissal of the Indictment because, as Hazelwood set forth in his Motion to Dismiss, the Indictment is facially invalid, as the conduct alleged was not illegal, and because "she is now deprived of the best evidence that would establish conclusively that there was in fact a *bona fide* doctor-patient relationship."  (Barbara-Rovedo Mot. at 3-4, ECF No. 236.)  Barbara-Rovedo contends that "[b]ecause the government failed to preserve the patient files in a usable format, evidence which is exculpatory and non-replicable, when it had at least three years to do so, should result in dismissal of the Indictment because Ms. Rovedo cannot fairly defend herself."  (*Id*. at 4.)  To the extent her claims rely on arguments put forth by Hazelwood denied above, the court also denies Barbara-Rovedo's Motion on those grounds.  The court reviews

Barbara-Rovedo's remaining arguments below.

The Constitution guarantees access to evidence.  *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001). Separate tests are used to determine whether the government's failure to preserve evidence constitutes a due process violation in cases where "materially exculpatory" evidence is not accessible, versus cases where "potentially useful" evidence is not accessible.  *Id.* The government violates a defendant's due process rights when it does not preserve "materially exculpatory" evidence. *California v. Trombetta*, 467 U.S. 479, 488-89 (1984); *Wright*, 260 F.3d at 570; *Caldwell v. Russell*, 181 F.3d 731, 738 (6th Cir. 1999), *abrogated on other grounds by Mackey v. Dutton*, 217 F.3d 399, 406 (6th Cir. 2000).  For evidence to meet this standard, it must be both exculpatory before its destruction, and the defendant must be unable to obtain comparable evidence by other reasonably available means. *Trombetta*, 467 U.S. at 488-89: *Wright*, 260 F.3d at 570-71. The destruction of materially exculpatory evidence violates the defendant's due process rights, regardless of whether the government acted in bad faith. *Trombetta*, 467 U.S. at 488; *Wright*, 260 F.3d at 571.

To establish a due process violation for the failure to preserve "potentially useful" evidence, a defendant must show that: (1) the government acted in bad faith in failing to preserve the evidence; (2) the exculpatory value of the evidence was apparent before its destruction; and (3) the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other means. *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *Monzo v. Edwards*, 281 F.3d 568, 580 (6th Cir. 2002); *Wright*, 260 F.3d at 571.  The finding of bad faith is particularly important.  *Youngblood*, 488 U.S. at 58; *Caldwell*, 181 F.3d at 739. A determination of bad faith turns upon the government's knowledge of the evidence's exculpatory value at the time it was lost

or destroyed. *Youngblood*, 488 U.S. at 56-57 n.8; *Wright*, 260 F.3d at 571. Negligence in failing to preserve exculpatory evidence is insufficient to establish bad faith. *Wright*, 260 F.3d at 571; *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996).

The Government contends that during its investigation of Defendants, it learned that an "internet-based 'portal'" was used by Defendants to conduct their business, which at some point may have contained "purported medical records from their customers." (Govt. Resp. at 3, ECF No. 291.) This portal was on a server, owned by a third party, Go-Daddy. (*Id*.) Defendants contracted with Go-Daddy. (*Id*.) The Government subsequently executed two search warrants on Go-Daddy to obtain evidence from deltahealthusa.com and the "edobedo" file. (*Id*.) Go-Daddy produced discs of information, but much of it was in an inaccessible format. (*Id*. at 4.) The Government was eventually able to glean some information from the discs using analysts, who produced spreadsheets containing "certain customer order information." (*Id*.) The Government contends that it has not destroyed any information it has obtained, or failed to preserve it. (*Id*.) The Government also maintains that it has produced all of the information it has obtained from Go Daddy, including the discs in the original format it was given, as well as the spreadsheet information. (*Id*.) In addition, the Government advised Barbara-Rovedo that she could speak with Hazelwood's counsel about obtaining access to the portal, if she no longer had access, to obtain the information she sought. (*Id*.) The Government also notes that it has provided to all of the Defendants, "the information from the computers that were searched at the time of the arrests in this case, including those located at Delta Health's business location, at Defendant Rovedo's home, and at James Hazelwood's home and business. These computers contained . . . medical records associated with DTO customers." (*Id*. at 4-5.)

The court finds the Government's arguments to be persuasive. Defendant's claims that the Government failed to preserve the patient files in a usable format fail under both tests, where "materially exculpatory" evidence is not accessible, and where "potentially useful" evidence is not accessible. For evidence to meet the standard of "materially exculpatory" evidence, it must be both exculpatory before its destruction, and the defendant must be unable to obtain comparable evidence by other reasonably available means. *Trombetta*, 467 U.S. at 488-89. Here, the evidence has not been destroyed. The Government has provided all the information it has access to from Go-Daddy, including that which it has been able to access, and that which it has been unable to, which contained on the discs provided by Go Daddy. The Government maintains it has turned over other evidence pertaining to alleged violations and that she has access to other sources, such as Defendant Hazelwood, to obtain pertinent information, which Barbara-Rovedo has not directly challenged. Therefore, Defendant Barbara-Rovedo cannot meet the standard for "materially exculpatory" evidence.

In order to meet the standard of "potentially useful" evidence that is not accessible, a defendant must show that: (1) the government acted in bad faith in failing to preserve the evidence; (2) the exculpatory value of the evidence was apparent before its destruction; and (3) the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other means. *Youngblood*, 488 U.S. at 57-58. Defendant Barbara-Rovedo is unable to meet any of the elements. She cannot demonstrate that the Government acted in bad faith, in order to meet the first element. The Government attempted to obtain information from the Go Daddy server, and once it received the discs from Go Daddy, attempted to access the information. While unable to access all of the information, the Government provided to Defendants what it was able to access. The

-24-

Government contends that it has not destroyed any information. (Resp. at 2, 5, ECF No. 291.)

As to the second element, Defendant argues that the Government knew of the "exculpatory value of the patient files before the information became non-retrievable." (Def. Mot. at 7, ECF No. 236.) Defendant relies on cases where the Government was informed of the exculpatory value of evidence in its possession, and despite this knowledge, destroyed the evidence. *See United States v. Bohl*, 25 F.3d 904 (10th Cir. 1994) (defendants requested radio transmission towers to be preserved to prove their innocence, but government disposed of towers); *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993) (despite defendant's argument that laboratory equipment seized by law enforcement was not used to manufacture methamphetamine, but instead had a legitimate use, government destroyed laboratory, preventing further examination of the equipment). This case is readily distinguishable from those cases, as the Government did not have the evidence in its possession. This information was in the possession of a third party, Go Daddy. Furthermore, the inability to access the information also cannot be attributed to the Government in the same way as *Bohl* and *Cooper*. The Government represents that it has done what it can to access all of the information on the discs, and has provided copies of the discs in their original format to the Defendants, so that Defendants might have to the opportunity to attempt to access the information. Therefore, Defendant has not demonstrated that she is able to meet the second element, that the apparent exculpatory nature of the evidence was apparent before destruction.

Additionally, Defendant has not shown that comparable evidence cannot be obtained through other means, the third element of "potentially exculpatory" evidence. As discussed above, Defendant has access to the information she seeks through other means, namely through evidence provided by the Government or access provided by Hazelwood's counsel. Therefore, Defendant

-25-

cannot truthfully assert that she has no comparable means to access the information contained on the discs.

Defendant cannot show that the Government destroyed or failed to preserve any evidence. As to Defendant's claim that the Government failed to obtain critically exculpatory evidence, Defendant fails to provide any support for her contention that the Government is required to obtain specific pieces of evidence from a third party.  Defendant also cannot show that this is the only means to obtain this information.  Therefore, Defendant's argument that she cannot fairly defend herself because of the Government's failure to preserve the patient files in a usable format is unavailing.  Accordingly, Defendant's Motion to Dismiss is denied.

### H. Darji's Motion to Dismiss Indictment for Failure to Properly Allege Knowledge Element

Defendant Darji seeks dismissal of the Indictment pursuant to the Due Process Clause of the Fifth Amendment for the Government's failure to properly allege the "knowingly" element contained in each of the counts charged against him.  Darji contends that the Indictment "falsely states that 21 C.F.R. § 1306.04(a) prohibits a registered pharmacist such as Mr. Darji from filling 'an order that purported to be a prescription, but was not a 'prescription' within the meaning of the [Controlled Substances Act] if the pharmacist knew or had reason to know that the issuing practitioner issued the 'purported prescription' outside the usual course of professional medical practice and not for a legitimate medical purpose.'" (Darji Mot. at 1, ECF No. 255.)  Defendant argues that the Government's use of the phrase "had reason to know" contradicts 21 C.F.R. § 1306.04(a), which requires the person to "knowingly fill such a purported prescription."  (*Id.* at 3.) Defendant maintains that Sixth Circuit case law requires a pharmacist to have actual knowledge that prescriptions he filled were invalid.  *See United States v. Stone*, No. 91-5561, 1992 WL 151290 (6th

-26-

Cir. June 29,1992); *United States v. Veal*, 23 F.3d 985 (6th Cir. 1994).  He contends that the Government has "improperly water[ed] down the knowledge element," and therefore the Indictment fails to set out the elements of the charged offense.  In order to "pass constitutional muster," under the Due Process Clause of the Fifth Amendment, "the indictment must set out all the elements of the charged offense," and because the Indictment here has failed to do so, Darji contends the Indictment must be dismissed.  (Darji Mot. at 4 (citing *United States v. Martinez*, 981 F.2d 867, 872 (6th Cir. 1992))).

Defendant cites to Paragraph 10 of the Introduction to the Indictment, as proof that the Government has "improperly watered down the knowledge element." (Indictment at 4-7, ECF No. 1.)  Defendant contends that this is Paragraph 10 of Count One, the conspiracy charge.  However, a closer look at the Indictment reveals that the Introduction includes an overview of the conspiracy and the CSA.  It does not specifically allege any charges against the Defendants, and is not a part of Count One.  (*Id*.)  Each of the Counts the Government has charged the Defendants with are found within "The Offense" section, and include the "knowingly" language, which  Defendant contends is required.  (*Id*. at 9-10, 139-143.)  The Government has not asserted that the Introduction is a part of the charges against the Defendant, and the Introduction cannot be read to be so, as it clearly provides a general overview of the charges against the Defendants.  The fact that the Government separately titled a section "The Offense," and proceeded to use language from the statute in conjunction with particular instances of Defendants' allegedly prohibited conduct, demonstrates its intent to lay out the charges against the Defendants therein.

Although Darji contends that the Sixth Circuit has read the knowledge element such that only actual knowledge will suffice.  This is not correct, as the Sixth Circuit has stated that the

government can also show that the pharmacist "deliberately closed [his] eyes to wrongdoing that should have been obvious to him."  *Veal*, 23 F.3d at 988 (citing *United States v. Seelig*, 622 F.2d 207, 213 (6th Cir. 1980)).   Therefore, the Government has properly set out all of the elements of the charged offense, including "knowingly," and is correct in stating that actual knowledge is not the only way in which a pharmacist can be held criminally liable.  Thus, there is neither a violation of due process, nor Sixth Circuit case law.  Accordingly, Defendant's Motion to Dismiss is denied.

### III.  HAZELWOOD'S MOTION FOR RECONSIDERATION

Defendant Hazelwood filed a Motion for Limited Reconsideration (ECF No. 233) of the court's ruling on his Omnibus Motion for Relief from Continuing Unlawful Wire Intercepts and Other Interference With Right to Counsel, the Right to Privacy, and Due Process of Law (ECF No. 145).  The court overruled Defendant's Motion, finding that "Sixth Circuit case law requires that a defendant demonstrate prejudice in order to show a violation of the attorney-client relationship rising to Constitutional dimensions, even if there has been an intentional intrusion by the government."  (September 21, 2010 Order at 2, ECF No. 169 (citing *U.S. v. Moses,* 337 F. App'x 443 (6th Cir. 2009)).  The Order further stated that

> [t]he Government stated on the record that neither they nor any member of the prosecution team has viewed or listened to any recordings of conversations between Defendant Hazelwood and his attorneys during the period of time that he was in Georgia or since his incarceration in Ohio.   As the Government has not viewed any of these records, and as a result the Defendant cannot and did not demonstrate prejudice, the motion was overruled by the court.  The court ordered that the sealed discs containing the phone calls between Defendant Hazelwood and his attorneys be turned over to Hazelwood's counsel, and the Government agreed to provide this information.

(*Id.*)

Although the Federal Rules of Criminal Procedure do not provide a standard for reconsideration, courts generally evaluate such motions under the same standard as a motion to alter or amend judgment pursuant to Federal Rule of Civil Procedure 59(e).  *See e.g.*, *United States v. Jarnigan*, No. 3:08-CR-7, 2008 U.S. Dist. LEXIS 101768, at *4 (E.D. Tenn. Dec. 17, 2008); *United States v. Mihalich*, No. 1:06-CR-345, 2006 U.S. Dist. LEXIS 83610, at *8 (N.D. Ohio Nov. 15, 2006).  Under this provision, the party requesting reconsideration must demonstrate that there has been: (1) an intervening change of controlling law; (2) newly discovered evidence; or (3) a clear error of law, or to otherwise prevent manifest injustice.  FED. R. CIV. P. 59(e); *Whitehead v. Bowen*, 301 F. App'x 484, 487 (6th Cir. 2008).

Hazelwood asserts two primary arguments as a basis for reconsideration: (1) deliberate intrusion of the attorney-client privilege; and (2) intercepted calls involve the attorney client privilege.  Hazelwood contends that his review of the audio recordings of conversations him while being detained in Georgia, prior to his being transferred to Ohio, demonstrates that he is entitled to discovery and/or a hearing regarding whether he suffered prejudice because of the disclosure of privileged material.  He maintains that without discovery, it is unlikely any aggrieved party could ever demonstrate prejudice.

The court finds Hazelwood's argument to be unpersuasive.  Although in some circuits, defendants would be entitled to a hearing if they could show the government's intrusion was intentional, that is not the law in this circuit.  In the court's previous oral ruling, and the subsequent Order issued, the court made clear that Sixth Circuit case law requires a party to demonstrate prejudice, in order to show violation of the attorney-client privilege, even if there has been an intentional intrusion by the Government.  (*See* September 21, 2010 Order at 2 (citing *Moses,* 337

-29-

F. App'x at 448-49).)  Hazelwood has not put forth any new information to dispute Assistant United States Attorneys, Rebecca Lutzko or Edward Feran's representations, that neither they, nor any member of the prosecution team has viewed or listened to any recordings of conversations between Defendant Hazelwood and his attorneys, while he was incarcerated in Georgia or Ohio.  It is Hazelwood's contention that the summary of the calls offered by the Government at the hearing demonstrates that they listened to the calls or that the taint attorney shared impermissible substantive information regarding the calls with them.  Similarly, Hazelwood's claims that although the Government represented that many of the calls were not covered by the attorney-client privilege, they in fact are.  Even if he is correct, he still fails to demonstrate how he has been prejudiced.

Defendant also seeks to raise the issue of the use of the taint attorney again, but relies on the same argument he used in his original Motion, offering nothing new. The court was previously aware of this argument, and took it into consideration when overruling Hazelwood's Motion.  As the court previously stated, it finds that Hazelwood has not shown that there is any basis upon which to hold a hearing and that no discovery is warranted.  Therefore, the court denies Hazelwood's Motion for Reconsideration.

### IV. HAZELWOOD AND DARJI'S MOTIONS FOR LIMITED DISCLOSURE OF GRAND JURY MINUTES

#### A. Hazelwood

Defendant Hazelwood seeks the disclosure of a "limited set of grand jury minutes relating to the legal instructions for Counts 1, 3-23 and 37 of the Indictment" pursuant to Rule 6(e)(3)(E) of the Federal Rules of Criminal Procedure.  (Mot. at 1, ECF No. 272.)  In the alternative, Hazelwood requests that the Government disclose this information to the court for an *in camera*

-30-

inspection. Hazelwood contends that the Indictment and the Government's past representations indicate that the Government is seeking to prosecute "what was plainly not unlawful at the relevant time," which is why he filed a Motion to Dismiss the Indictment.  (*Id*. at 4.)  In light of these concerns, Hazelwood is seeking the disclosure of the legal instructions to the grand jury. He maintains that "there is a serious likelihood that the Government misinformed the grand jury regarding the legal requirements to find the sale of pain medications pursuant to a prescription to be a criminal violation or alternatively impermissibly relieved the grand jury of finding the required elements." (*Id*. at 5.)  Defendant bases this claim on his argument that the conduct alleged in the Indictment was not illegal at the time, as the Ryan Haight Act had not been passed yet.  He further asserts that he needs this information to avoid a possible injustice at trial, to determine whether the grand jury actually found probable cause, and to preclude a constructive amendment at trial.  (*Id*. at 7.)  Hazelwood contends that since the grand jury has already returned its Indictment, Hazelwood's need outweighs the need for secrecy.  He also asserts that as the Indictment returned by the grand jury publicly names his co-defendants, there is no need for continued secrecy on this basis. (*Id*. at 10.)  Further, because he does not seek witness testimony, Hazelwood maintains there is no risk that witnesses in this case or future grand jury investigations would fear retribution.  (*Id*.)

Generally, an accused is not entitled to see grand jury transcripts unless it is required by the ends of justice, and he shows that a particular need for disclosure exists that outweighs the need for secrecy. *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (1958); *Garret v. Moore*, No. C-1-05-102, 2007 WL 315093, *10 (S.D. Ohio Jan. 30, 2007); *Blalock v. Wilson*, No. 1:04 CV 2156, 2006 WL 1866666 (N.D. Ohio June 30, 2006); *United States v. Tennyson*, 88 F.R.D. 119, 121 (E.D. Tenn. 1980).  Grand jury proceedings are afforded a presumption of regularity. *United States*

*v. Azad*, 809 F.2d 291, 295 (6th Cir. 1986).  Grand jury material may be disclosed where it appears that failure to do so will deny the defendant a fair trial.  *Blalock*, 2006 WL 1866666.  To determine whether the grand jury secrecy should be lifted, the party seeking disclosure must demonstrate that: "(1) the material sought is needed to avoid a possible injustice in another judicial proceeding; (2) the need is greater than the need for continued secrecy; and (3) the request is structured to obtain only the material needed." *In re Antitrust Grand Jury*, 805 F.2d 155, 161 (6th Cir. 1986) (citing *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979)).  Rule 6(e) of the Federal Rules of Criminal Procedure allows discovery of grand jury proceedings "upon a showing that grounds may exist for a motion to dismiss the indictment" or "preliminarily to or in connection with a judicial proceeding."  In order to prevail, a "defendant seeking the production of grand jury records must do more than make general unsubstantiated or speculative allegations of impropriety." *United States v. Stafford*, No. 08-122, 2009 WL 275470, at *3 (D. Del. Feb. 5, 2009).

Defendant has failed to demonstrate a particularized need for the disclosure of the grand jury instructions.  Defendant's arguments regarding the illegality of the actions during the time period alleged in the Indictment have already been addressed above.  The court found the Indictment to be facially valid.  Defendant's arguments regarding probable cause are similarly unavailing, as the Indictment demonstrates the grand jury's findings of probable cause.  As courts have noted, "the mere suspicion that the grand jury may not have been properly instructed with respect to the legal definition . . . is insufficient to establish that [defendant] is entitled either to dismissal of the indictment or to disclosure of grand jury materials." *United States v. Trie*, 23 F. Supp.2d 55, 62 (D.D.C. 1998) (citing *United States v. Buchanan*, 787 F.2d 477, 487 (10th Cir. 1986)).

Hazelwood's speculative arguments based on his suspicions of impropriety regarding the grand jury, are insufficient to demonstrate a particularized need in light of the court's discussion above of Hazelwood's Motion to Dismiss the Indictment.  Furthermore, Hazelwood's argument regarding the potential for a constructive amendment at trial similarly fails to demonstrate a particularized need, as this is a risk in every trial, and therefore cannot serve as compelling reason for the disclosure of the grand jury instructions in this case.  Additionally, as stated above, there is no indication that there have been shifting legal theories, or that the Government seeks to amend the charges in the Indictment.

Assuming, for the sake of his Motion, that Hazelwood is correct in noting that there is not as great a need for secrecy following the return of the Indictment in this case, and his request is limited, he still must make some showing of particularized need sufficient to outweigh the interests of secrecy.  The *Douglas* court noted that "the interests in grand jury secrecy, although reduced, are not eliminated merely because the grand jury has ended its activities."  441 U.S. at 222.  The *Douglas* court further stated that when considering the disclosure of grand jury materials, "the courts must consider not only the immediate effect upon a particular grand jury, but also the possible effect upon the function of future grand juries."  *Id*.  Hazelwood has failed to demonstrate that his need outweighs such interests. He has also failed to demonstrate that an *in camera* inspection by the court is necessary.  Therefore, Hazelwood's Motion is denied in its entirety.

### B. Darji

Defendant Darji seeks the production of grand jury minutes containing the legal instructions given to the grand jury, or in the alternative, an *in camera* inspection by the court of such minutes. Darji incorporates his arguments made within his Motion to Dismiss Indictment for Failure to

-33-

Properly Allege the Knowledge Element.  He contends that the "improper prosecutorial watering down of the knowledge element" raises questions regarding what the prosecutors told the grand jury about the knowledge element required.  Darji further states that the Indictment "seriously and erroneously minimizes the culpable mental state to hold Defendant Darji liable for each account," which establishes his "particularized need."  However, the court discussed Darji's Motion above, and denied it, finding the Government had properly alleged the knowledge element.  Therefore, Darji has failed to demonstrate his particularized need.

Darji also makes an argument similar to that made by Hazelwood regarding the fact that the continuing need for secrecy has been diminished.  However, like Hazelwood, he has failed to demonstrate that his needs outweigh the interests in grand jury secrecy in this case or the potential effect upon the function of future grand juries.  Darji has also failed to demonstrate that an *in camera* inspection by the court is necessary.  Therefore, Darji's Motion is denied in its entirety.

## V. HAZELWOOD'S MOTION FOR PRETRIAL DISCLOSURE OF SPECIFIED *BRADY* MATERIALS

Defendant Hazelwood has filed a Motion for the Pretrial Disclosure of Specified *Brady* Material.  Hazelwood seeks information favorable to him that can dispute the Government's allegations.  Specifically, he requests:

> (1) all documents that show a doctor involved in the alleged conspiracy declined to issue or renew a prescription for any reason;
>
> (2) all documents that show a pharmacist involved in the alleged conspiracy declined to fill or refill a prescription for any reason;
>
> (3) all documents that show Hazelwood was aware of the fact that doctors and pharmacists in this case had declined to issue or refill prescriptions;

-34-

> (4) all documents that show the Government seized the documents set forth above;
>
> (5) all documents that show Government undercover agents attempted to obtain prescription for or buy Schedule III or Schedule IV drugs but the sale was not consummated for any reason; and
>
> (6) all evidence of the alleged co-conspirators' efforts to comply with law and regulations.

(Mot. at 2, ECF No. 249.)  Hazelwood contends that, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and Rule 16(a)(1)(E)(i) of the Federal Rules of Criminal Procedure, he is entitled to such exculpatory information.  He maintains that he has contacted the Government to request this information, but the Government has responded that they have produced or will produce the requested information consistent with their obligations.  Hazelwood argues that the court should require the Government to "segregate the requested *Brady* materials and produce them to [him]," identify the location of requested materials that the Government asserts it has produced within its "voluminous document production," and to "identify the location of any other *Brady* materials it has produced pursuant to previous *Brady* requests."  (Mot. at 10.)  Hazelwood argues the requested *Brady* material is material under Rule 16(a)(1)(E)(i) of the Federal Rules of Criminal Procedure, because it is evidence material to the preparation of his defense.

The Government argues that Hazelwood has no pretrial remedy under *Brady*.  The Government maintains that the Sixth Circuit has stated that *Brady* was never intended to create pretrial remedies.  *See United States v. Moore*, 439 F.2d 1107, 1108 (6th Cir. 1971); *see also United States v. Short*, 671 F.2d 178, 187 (6th Cir. 1982).  *Brady* offers defendants a post-trial remedy, not a pretrial one.  The Government also notes that to the extent Hazelwood is including *Giglio v. United States*, 405 U.S. 150 (1972), impeachment material as part of the requested *Brady* materials

that he asserts he is entitled to, he is also incorrect. The Government asserts that the Sixth Circuit has stated that evidence used solely for the impeachment of witnesses must be turned over to the defendant in time for it to be used on cross-examination at trial. *United States v. Presser*, 844 F.2d 1275, 1283-84 (6th Cir. 1988). Therefore, the Government asserts, Hazelwood is also not entitled to this evidence on this basis at this time.

The Government does not provide any response to Hazelwood's argument that he is entitled to the requested material under Rule 16(a)(1)(E)(i) of the Federal Rules of Criminal Procedure. The Government has maintained that it is aware of its obligations and it has turned over all the evidence to which Hazelwood is entitled. (Gov't. Resp. at 2-3.) As Hazelwood is unable to point to specific information in the Government's possession that it has refused to provide, and the Government has not specifically stated if it has provided the requested materials, the court orders the Government to inform Hazelwood whether the requested materials have been produced.

The Government also argues that it has no obligation to segregate *Brady* material. The Sixth Circuit has stated that generally the government is under no obligation to direct defendant to exculpatory evidence within a large volume of evidence it has produced. *United States v. Warshak*, 631 F.3d 266, 297-98 (6th Cir. 2010). The court did note though, that if the Government were to pad its production with pointless information to frustrate the review of the material, it might constitute a *Brady* violation. In addition, Rule 16 also does not entitle Hazelwood to relief, as Rule 16 is "entirely silent on the issue of the form that discovery must take; it contains no indication that documents must be organized or indexed." *Id*. at 297. In any event, although it does not have a requirement to do so, the Government maintains that at the January 21, 2011 hearing, it informed the court that it would assist counsel in locating specific materials, and that Hazelwood has not

-36-

contacted them.  Hazelwood attaches the letters he has written to support his claim that he has in fact contacted the Government numerous times, but has yet to receive any such assistance.

The court finds the Government has no general duty to segregate the materials it has produced and locate pertinent information.  However, as the Government agreed to do so, and Hazelwood maintains he has contacted the Government but received no response, the court will further discuss this issue at the upcoming pretrial hearing.  Accordingly, Hazelwood's Motion is denied.

## VI. DEFENDANT DARJI'S MOTION TO COMPEL PRODUCTION OF RULE 16 DISCOVERY

Defendant Darji moved for the production of the following documents pursuant to FED.R.CRIM.P. 16(a)(1)(E), as items that are material to his defense:

> 1. Attorney Max Kravitz's May 11, 2005 letter sent to Ira Wald and Ian Ives of the DEA Tampa office following DEA's visit to Mr. Darji's Medicine Shoppe Pharmacy on May 2, 2005 [] disagreeing with the DEA guidance document concerning Internet pharmacies;
>
> 2. Attorney Max Kravitz's November 23, 2005 letter sent to DEA Diversion Investigator Deborah Butcher of the DEA Tampa office confirming that Mr. Darji's Medicom RX mail order division did not intend to fill prescriptions for controlled substances after November 30, 2005 [];
>
> 3. Attorney Max Kravitz's January 30, 2006 letter sent to DEA Diversion Investigator Deborah Butcher of the DEA Tampa office advising that Medicom RX is again filling Internet-generated prescriptions[]; and
>
> 4. Attorney Max Kravitz's August 2, 2007 letter sent to DEA Group Supervisor Roberta Goralczyk of the DEA Tampa office recounting the July 16, 2007 meeting between Kravitz, Mr. Darji, Ms. Goralczyk, and DEA Diversion Investigators Deborah Butcher and James Graumlich in which Mr. Kravitz informed DEA that Mr. Darji had stopped filling Internet-generated prescriptions [].

(Mot. at 1-2, ECF No. 259.) The Government responded to Darji's August 19, 2010 request for the correspondence from Max Kravitz ("Kravitz") to the DEA, by providing Darji with three letters from Kravitz to the DEA, dated August 2, 2007; August 10, 2007; and October 9, 2007. (Resp. at 1, ECF No. 298). Darji then made a second request asking for three additional letters, dated May 20, 2005; November 22, 2005; and January 30, 2006. (*Id*. at 1-2.) Following this request, the Government followed up with DEA investigators regarding those letters. The investigators confirmed that the Government did not have those letters in their possession. Government counsel contends that she informed Darji's counsel orally of the information last fall, but did not do so in writing. (*Id*. at 2.)

In any event, after reviewing its files, the Government maintains that it has produced all the records it possesses in regard to the correspondence between Defendant's former counsel, Kravitz, and the DEA. (*Id*.) The Government also produced correspondence with Kravitz's law partners, Janet Kravitz and Paula Brown. (*Id*.) Although the Government says it is unlikely to locate any additional records, if it does, it will promptly produce them. (*Id*.)

Darji has not filed a reply, contesting any of the Government's assertions. Therefore, based on the Government's representations that it has made a good faith effort to locate the other letters Darji seeks, the court finds that it has turned over all of the relevant letters in its possession. As it does not have the remaining letters, the court cannot order it to produce evidence which it does not possess. Therefore, Darji's Motion is denied.

### VII. HAZELWOOD'S MOTION TO STRIKE SURPLUSAGE FROM THE INDICTMENT

Defendant Hazelwood requests that the court strike irrelevant and prejudicial surplusage from the Indictment pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure. Specifically,

Hazelwood requests the following terms to be stricken: "Hazelwood Drug Trafficking Organization," "Hazelwood DTO," "pill mill," claims that the co-conspirators conspired to illegally dispense and prescribe "hundreds of thousands of prescription pills" through the use of "thousands of prescriptions" that they knew were illegal, and Hazelwood's alleged drug use, which are uncharged bad acts put forth by the Government.  (Mot. at 1-2, 5, ECF No. 209.)  If the court is unwilling to grant such relief, Hazelwood requests in the alternative, that the court present a summary of the offenses charged to the jury, rather than allowing it to review the entire Indictment.

A district court may, within its discretion, strike surplusage from the Indictment pursuant to Federal Rule of Criminal Procedure 7(d).  *United States v. Kemper*, 503 F.2d 327, 329 (6th Cir. 1974).  A court should grant a motion to strike surplusage "only where it is clear that the language is irrelevant and prejudicial."  *Id*.  Furthermore, the Sixth Circuit has stated that Rule 7(d) "makes the striking of surplusage permissive, but not mandatory.  The Rule is properly invoked when an indictment contains nonessential allegations that could prejudicially impress the jurors."  *Id*.  The court further stated that "the standard under Rule 7(d) has been strictly construed against striking surplusage."  *Id*.

### A. "Hazelwood Drug Trafficking Organization" or "Hazelwood DTO"

"Hazelwood Drug Trafficking Organization" and "Hazelwood DTO" are used by the Government to refer to the drug trafficking conspiracy because "Hazelwood is the lynchpin of the conspiracy."  (Gov't. Resp. at 4, ECF No. 215.)  The Government contends that he was the focus of the Title III, represented himself to be in charge of the companies distributing the controlled substances, and paid conspiracy members for their contributions.  (*Id*.)  The Government argues that this language is a proper description and should not be stricken because it describes the

organization "Hazelwood ran and profited from." (*Id.*)  Hazelwood contends these references are irrelevant and prejudicial.  Hazelwood asserts that the language is "highly prejudicial to [him] because it serves to both obscure the actual identity of the actors performing the alleged criminal activities and ascribes all such criminal behavior to Hazelwood."  (Mot. at 4.)

The court finds Hazelwood's arguments on this language to be persuasive.  The court, in *United States v. Reyes*, 922 F. Supp. 818, 839-840 (S.D.N.Y. 1996) faced a similar request by the defendant Reyes when the indictment contained references to "Reyes Crew."  The court found:

> the references to the "Reyes Crew" are both prejudicial and inflammatory.  If a RICO enterprise or RICO conspiracy were established at trial, Reyes would face an insurmountable task in convincing the jury that he was not a member of the enterprise or the conspiracy bearing his name.  Similarly, the challenged allegation is neither admissible nor relevant.  In its Memorandum, the Government states that it intends to prove that Reyes was the organizer and undisputed leader of a criminal enterprise engaging in large-scale narcotics trafficking . . .Thus, while the Government may prove that Reyes was an organizer and leader of the enterprise, the made-up term "Reyes Crew" is neither admissible nor relevant.

*Id*.  The terms "Hazelwood Drug Trafficking Organization" and "Hazelwood DTO" are similarly irrelevant and prejudicial to Hazelwood. Therefore, the court hereby strikes all references to the "Hazelwood Drug Trafficking Organization" and "Hazelwood DTO" from the Indictment.

### B. "Pill Mill," "Hundreds of Thousands of Prescriptions," and "Thousands of Prescriptions That They Knew Were Illegal"

Hazelwood seeks to have references that he and his co-conspirators ran a "pill mill," and conspired to illegally dispense and distribute "hundreds of thousands of prescription pills," by "thousands of prescriptions that they knew were illegal" stricken. (Mot. at 4.) Hazelwood contends these allegations are irrelevant and prejudicial since the Indictment only alleges 22 instances where

-40-

controlled substances were dispensed and distributed. He further maintains that this language is unnecessary to establish the elements of the charged crimes. Hazelwood cites *United States v. Zabawa*, 39 F.3d 279, 285 (10th Cir. 1994) in support of his argument that these terms should be stricken. In *Zabawa*, the Tenth Circuit affirmed a district court's ruling striking language in the multi-defendant indictment that referenced 6,708 victims, which the government had used to demonstrate the scope of the fraudulent scheme in the counts charged. However, the government only identified thirty victims in the indictment, and could establish all the elements of the charged offenses without the reference to the 6,708 victims. *Id*.

The Government asserts that Hazelwood made references to "pill slinging" and referred to customers as "pill heads," and therefore, "pill mill" is "factually supported and proper." (Resp. at 5.) As to the language referencing the thousands of prescriptions and hundreds of thousands of pills, the Government contends this language is also proper since Defendants are charged with distributing more controlled substances than just the controlled buys contained within the Indictment. (*Id*.) For instance, the "intercepted telephonic communications referenc[e] the distribution of hundred of thousands of prescription pills." (*Id*.)

The court finds the Government's arguments to be well-taken. Language is to be stricken from an indictment as surplusage "only where it is clear that the language is irrelevant and prejudicial." *Neller*, 2000 US App. LEXIS 22414 at * 5. The fact that language may be prejudicial to the defendant is not sufficient to warrant the striking of language in the Indictment. It must also be irrelevant. The Government has indicated that it is charging Hazelwood with distributing more controlled substances than the controlled buys contained within the Indictment. Therefore, the statements referencing "hundreds of thousands of prescription pills," by "thousands of prescriptions

that they knew were illegal" accurately reflect information regarding charges the Government intends to prove at trial.  Unlike the indictment at issue in *Zabawa*, the Defendants here are accused of engaging in a conspiracy.  The district court in *Zabawa* appropriately concluded that the government could prove all the elements of the charged offenses without references to the overall numbers of people that were victims of the fraudulent scheme.  Here, the Government is alleging the "hundreds of thousands of prescription pills," and "thousands of prescriptions that they knew were illegal" language describes the conduct it is charging in the conspiracy, overt acts by Defendants.  Though it may be prejudicial to Defendants, it is not irrelevant, and therefore the court denies the Motion as to this language.

The court also denies the Motion in regard to the language that references "pill mill."  The use of the phrase "pill mill" is not much different than other words like "drug organization," "drug house," or "stash house."  They seek to characterize the nature of the allegedly illegal operation. While it is true that there is no one place that the operation is to allegedly have been undertaken, because the Internet is being used, it is not inappropriate to refer to the overall operation in that fashion.  It supports the Government's contentions that the Defendants prescribed "hundreds of thousands of prescription pills," by "thousands of prescriptions that they knew were illegal," which the Government intends to prove at trial.  Although it may be prejudicial to Hazelwood, it is not irrelevant.  Accordingly, the Motion is denied on this ground.

### C. Hazelwood's Drug Use

Hazelwood requests that the court strike language in the Indictment regarding his drug use since the language is irrelevant and prejudicial, as he has not been charged with the illegal use of a controlled substance.  The Government contends that this language is relevant evidence regarding

several things, including his mental state.  It plans to present evidence that Hazelwood repeatedly used and sold drugs, and was "completely aware of the addictive nature of the controlled substances."  (Resp. at 215.)  The Government maintains that "[t]he use of controlled substances, the unauthorized distribution of controlled substances to friends, and the advice that Hazelwood gave to drug addicted customers is evidence that Hazelwood did not operate a legitimate business." (*Id.*)

The Indictment charges Hazelwood with conspiracy to distribute controlled substances, conspiracy to commit money laundering, distribution of Schedule III controlled substance, distribution of Schedule IV controlled substance, money laundering, and engaging in a continuing criminal enterprise.  The conspiracy charge alleges that the defendants

> did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree together and with each other and with other persons . . . commit an offense against the United States of America, to wit:
>
> > 1) to unlawfully, knowingly, and intentionally distribute and dispense hydrocodone . . . ;
> >
> > 2) to unlawfully, knowingly, and intentionally distribute and dispense alprazolam . . . ;
> >
> > 3) to knowingly and intentionally use and cause to be used a registration number that was issued to another person in the course of distributing and dispensing hydrocodone and alprazolam . . . ;
> >
> > 4) to knowingly and intentionally use a communication facility, that is, the internet, to commit and facilitate the conspiracy to distribute and dispense hydrocodone and alprazolam . . . ;
> >
> > 5) to knowingly and intentionally use and cause to be used certain places for the purpose of distributing and dispensing hyrdocodone . . . .

-43-

(Indictment at 9-10, ECF No.1.)  Count 2 alleges Hazelwood "did knowingly and intentionally combine, conspire, confederate and agree together and with diverse other persons both known and unknown to the grand jury to knowingly and intentionally conduct and attempt to conduct a series of financial transactions . . . ."  (*Id*. at 132-33.)  Counts 3-19 allege Hazelwood "did unlawfully, knowingly, and intentionally distribute and dispense hydrocodone . . . and did aid and abet each other [Toennies, Rovedo, Fernandez-Montalvo, Darji, Liddy, Fiorillo, and Derks] . . . ." (*Id*. at 139-40.)  Count 23 alleges Hazelwood "did unlawfully, knowingly, and intentionally distribute and dispense 60 tablets of alprazolam . . . ."  (*Id*. at 143.)  Counts 24-36 allege Hazelwood "did knowingly engage and attempt to engage in a monetary transaction, by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000 . . . ."  (*Id*. at 143-44.)  Count 37 alleges Hazelwood

> did unlawfully, knowingly, and intentionally engage in a continuing criminal enterprise in that he unlawfully, knowingly, and intentionally violated Title 21, United States Code, Sections 841(a)(1), 843, 846, and 856(a)(1) . . .

(*Id*. at 145-46.)  None of the elements of the charges in the Indictment indicate that Hazelwood's prior drug use is relevant in making out a *prima facie* pleading of a violation of any of the statutes. The only essential allegations regarding *mens rea* are unlawfully, knowingly, and intentionally. *See United States v. Cooper*, 384 F. Supp.2d 958, 960 (W.D. Va. 2005) (finding that references to history of defendant's past dealings with environmental and health agencies would be stricken despite claims by the government information was relevant to mental state, since only essential allegation regarding *mens rea* was that defendant acted knowingly).  Therefore, Hazelwood's drug use is not relevant to the charges at issue.  Moreover, Hazelwood has not been charged with illegally using controlled substances, which also makes the information irrelevant.  *See U.S. v.*

*Kelley,* No. 08-00327-CG, 2009 WL 2176347, at *3 (S.D. Ala. July 17, 2009) (striking term "steroid user" because the indictment did not charge the defendants with illegally using anabolic steroids, making the term irrelevant and only included to inflame the jury). The court finds that the inclusion of references to drug use by Hazelwood in the Indictment is both unfairly prejudicial and irrelevant, and must be stricken.

### D. Summary of the Indictment

The court denies Hazelwood's alternative request to not allow the jurors to view the Indictment. The court is not persuaded that the cases cited by Defendant requires such a result. One case, *United States v. Watters*, No. 3:10CR4, 2010 WL 3369844 (N.D. Ohio Aug 4, 2010), merely indicates Judge Carr's practice of never reading to the jury or providing it with the indictment. The other case, *United States v. Poulsen*, No. CR2-06-129, 2008 WL 4326461 (S.D. Ohio Sept. 22, 2008), did not allow the jury to view the indictment based on a previous ruling in the trial of the defendant's co-defendants, and instead read a brief description of the case during opening instructions. The court also read the "Overt Acts" section of the indictment, but did not allow the jury to view the section. The *Poulsen* court did not provide any reasoning for its decision in that instance or why it had done so in the previous trial of defendant's co-defendants. Therefore, the court denies Hazelwood's alternative request not to allow jurors to view the Indictment.

While the court finds the Defendant has not shown he has a right to have the jury view only a summary of the Indictment, the court does have discretion in this area. *See U.S. v. Smith*, 419 F.3d 521, 530 (6th Cir. 2005) (finding that district court has discretion whether or not to read an indictment to the jury). The court reserves the right to read a summary, rather than a 147-page Indictment to the jury, or to read a redacted version.

-45-

For the reasons stated herein, the court hereby strikes references to "Hazelwood DTO," "Hazelwood Drug Trafficking Organization," and references to drug use by Hazelwood.  The court denies Hazelwood's Motion to Strike Surplusage From the Indictment in regard to the following language: "pill mill," "hundreds of thousands of prescription pills," and "thousands of prescriptions that they knew were illegal."

## VIII. HAZELWOOD'S MOTION TO COMPEL RETURN OF ATTORNEY-CLIENT COMMUNICATIONS

Defendant Hazelwood seeks the return of confidential attorney-client communications intercepted through the Title III intercept and the production of documents related to the Government's minimization efforts.  (Mot. at 1, ECF No. 151.)  Hazelwood contends certain recordings, specifically call nos. 57, 672, and 708[3], are privileged, and requests that the court compel the Government to secure the return of all copies of the recordings from Government personnel and others, and return them to his counsel.  Because these calls are privileged, Hazelwood asserts that he is entitled to the following: "suppression of any further use of the attorney-client communications other than for the purposes of adjudicating Hazelwood's right to further relief," periodic reports and final report to the court on progress and conduct of the wire, copies of all minimization procedures or policies, all minimization logs utilized by the monitoring and supervising agents, any applications and orders regarding the sealing of the intercepted communications, an inventory, and documentation from the Government identifying all persons who have had access to the privileged materials.  (*Id.* at 6-7.)  Hazelwood maintains that

---

[3]      The court notes that Hazelwood indicated this call was privileged in his supplemental brief filed on February 11, 2011. (ECF No. 288.)  The Government did not respond to this claim regarding this phone call.

"privileged material that should have been sealed remains unsealed and in the hands of third parties." (Supp. Br. at 2, ECF No. 288.)  In addition, he asserts that the Government has to think the calls are privileged since it designated calls 57 and 672 as privileged.  (Reply at 2, ECF No. 180.)

The Government does not object to three of Hazelwood's requests.  The Government provided Hazelwood's counsel with the minimization log at Hazelwood's May 12, 2010 arraignment.  (Resp. at 3, ECF No. 171.)  The Government has already provided Hazelwood with the statutory inventory at his initial appearance in Georgia and/or his arraignment in this court. (*Id*.)  The Government has not produced the sealing order to Hazelwood, but is willing to produce it in order to demonstrate to him that the wiretap was properly sealed.  The court hereby authorizes the Government to produce the sealing order.  The Government also states it would be willing to send a letter to Hazelwood's co-defendants asking them not to listen to the calls while his motion was pending.[4]  The Government opposes the rest of Hazelwood's requests because Sixth Circuit case law requires defendants to "establish a pattern of improper interception throughout the period of the wiretap, not merely identify particular calls as allegedly improper."  (*Id*; *see also United States v. Lawson*, 780 F.2d 535, 540 (6th Cir. 1985).)  In *Lawson*, the defendants presented 117 of 9,000 calls as samples of a lack of minimization.  780 F.2d at 540.  The *Lawson* court stated that it was not enough for defendants to identify particular calls which they contend should not have been intercepted, they must establish a pattern of interception of innocent conversations which develop over period of wiretap.  *Id*.  The Sixth Circuit found that the defendants had not presented

---

[4]      Hazelwood contends that to date, the Government has not sent such a letter to his co-defendants.

-47-

a prima facie pattern of abuse, and affirmed the overruling of the suppression motion by the district court.  Like *Lawson*, Hazelwood presents no prima facie case of abuse.  Here, there were 3,116 calls intercepted, of which 2,191 were completed.  Hazelwood is only disputing three of the calls.  Therefore, under *Lawson*, Hazelwood would not be entitled to relief.

Hazelwood asserts that the three calls are attorney-client communications, which are privileged, and are indicative of a larger failure by the Government to properly minimize calls.  The Government contends that, although it has not listened to the calls at issue, a taint attorney has reviewed the calls and provided it with a generic description in order to respond to Hazelwood's Motion.  Based on these descriptions of the calls, the Government contends the calls (57 and 672) were not subject to the attorney-client privilege, and therefore he is not entitled to additional discovery.

On May 19, 2011, the court requested the recordings at issue from the Government in order to conduct an *in camera* review.  (ECF Nos. 353, 354.)  After a review of the three calls, the court finds call no. 57, to refer to representation of a third party, as the Government had represented.  Call no. 672 also concerns the representation of a third party and an exchange regarding Hazelwood's treatment by Customs upon his return from an overseas trip, as the Government had represented.  Call no. 708 is regarding advice Hazelwood would like to get in the future, but no actual advice is provided within the call.  These calls have no bearing on the merits of this case and cannot conceivably be prejudicial to Hazelwood.  Call no. 57 is clearly not subject to the attorney-client privilege.  Call nos. 672 and 708 are arguably covered by the attorney-client privilege, but have no possible relevance to this case.  Therefore, it is not prejudicial to Hazelwood for the parties to have them.  Nonetheless, the court orders the return of these calls from Hazelwood's co-defendants to

-48-

Hazelwood's counsel. The court finds that Hazelwood is not entitled to the discovery requests he has made in light of the numerous phone calls intercepted, of which Hazelwood can only point to three calls to indicate allegedly improper conduct by the Government. Therefore, the court grants Hazelwood's Motion regarding the return of the phone calls (57, 572, and 708), and denies the rest of his Motion.

## IX. CONCLUSION

For the foregoing reasons, the court denies the following motions: Defendant Hazelwood's Motion for Dismissal of the Indictment (ECF No. 223), Defendant Darji's Motion to Dismiss the Indictment for Violation of the Due Process Clause of the Fifth Amendment (ECF No. 270), Defendant Darji's Motion to Dismiss Indictment for Failure to Properly Allege Knowledge Element (ECF No. 255), Defendant Ryan's Motion to Dismiss Indictment (ECF No. 256), Defendant Barbara-Rovedo's Motion to Dismiss (ECF No. 236), Defendant Hazelwood's Motion for the Pretrial Disclosure of Specified *Brady* Material (ECF No. 249), Defendant Darji's Motion to Compel Production of Rule 16 Discovery (ECF No. 259), Defendant Hazelwood's Motion for Reconsideration (ECF No. 233), Defendant Hazelwood's Motion for Limited Disclosure of Grand Jury Instructions (ECF No. 272), and Defendant Darji's Motion for Production or in Camera Inspection of Grand Jury Minutes (ECF No. 262). The court grants in part and denies in part the following motions: Defendant Hazelwood's Motion to Strike Surplusage From the Indictment (ECF No. 209) and Hazelwood's Motion to Compel Return of Attorney Client Communications Intercepted Through Title III Intercept and to Compel Production of Discovery (ECF No. 151).

IT IS SO ORDERED.

/s/SOLOMON OLIVER, JR.
CHIEF JUDGE
UNITED STATES DISTRICT COURT

June 27, 2011

**Appendix A**

| ECF No. | Motion | Defendants Joining in Motion |
|---|---|---|
| 151 | Hazelwood's Motion to Compel Return of Attorney Client Communications Intercepted Through Title III Intercept and to Compel Production of Discovery | |
| 209 | Hazelwood's Motion to Strike Surplusage from Indictment | Ryan, Toennies, Darji, Sasaki, Kann, Derks, Fernandez- Montalvo |
| 223 | Hazelwood's Motion to Dismiss Indictment | Rovedo, Toennies, Fernandez-Montalvo, Liddy |
| 233 | Hazelwood's Motion for Reconsideration re 145 Omnibus Motion for Relief From Continuing Unlawful Wire Intercepts and Other Interference With Right to Counsel, the Right to Privacy, and Due Process of Law | |
| 236 | Rovedo's Motion to Dismiss Indictment | Hazelwood, Darji, Liddy, Sasaki |
| 249 | Hazelwood's Motion for Pretrial Disclosure of Specified Brady Material | Darji, Ryan, Kann, Sasaki |
| 255 | Darji's Motion to Dismiss Indictment for Failure to Properly Allege Knowledge Element | Ryan, Liddy, Derks, Hazelwood, Sasaki |
| 256 | Ryan's Motion to Dismiss Indictment | Derks, Kann, Sasaki |
| 259 | Defendant Darji's Motion to Compel Production of Rule 16 Discovery | Derks, Hazelwood, and Sasaki |
| 262 | Defendant Darji's Motion for Production or in Camera Inspection of Grand Jury Minutes | Derks, Sasaki |
| 270 | Darji's Motion to Dismiss Indictment for Violation of Due Process Clause and 5th Amendment | Derks, Sasaki |
| 272 | Hazelwood's Motion for Limited Disclosure of Grand Jury Instructions | Sasaki |