UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 1:10 CR 150 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| JAMES HAZELWOOD, *et al.*, | ) | |
| | ) | |
| Defendants | ) | <u>ORDER</u> |

Defendant James Hazelwood ("Hazelwood"), along with eleven other defendants, are charged with various offenses arising out of a purported Internet-based drug trafficking organization. Currently pending before the court are Defendant Vinesh Darji's ("Darji") Motion to Preclude Direct and Derivative Use of Any Telephone Calls Involving Mr. Darji Intercepted Over Target Telephone Number 813-810-7268 (ECF No. 258), joined in by Hazelwood; Defendant Darji's Motion to Suppress His Conversations on the Hazelwood Wiretap Based on Lack of Individualized Necessity (ECF No. 266), joined in by Stephen Derks ("Derks") and Terence Sasaki ("Sasaki"); Defendant Darji's Motion for *Franks*' Hearing to Suppress Darji's Conversations Recorded Pursuant to Court-Ordered Wiretaps on Cell Phone Number 404-694-9560 (ECF No. 267), joined in by Derks and Sasaki; Defendant Darji's Motion for a *Franks'* Hearing to Suppress Materials Seized Pursuant to Search Warrants (ECF No. 268), joined in by Derks and Sasaki; Defendant Hazelwood's Motion for Notice of the Government's Intention to Offer into Evidence Unlawfully Seized E-mail and to Suppress (ECF No. 323); Defendant Hazelwood's Motion for Notice of the Government's Intention

to Offer into Evidence Material Seized From Hazelwood's Residence (ECF No. 327); Defendant Bruce Liddy's ("Liddy") Motion to Suppress Statement & Request for Evidentiary Hearing (ECF No. 324); Defendant Liddy's Motion to Exclude 404(b) Evidence & Request for Evidentiary Hearing (ECF No. 325); Defendant Darji's Motion for Disclosure of Evidence That the Government Intends to Introduce Pursuant to F.R.E. 404(b) (ECF No. 348); Defendant Sasaki's Motion for Court to Set a Date by Which the Government Must Disclose Evidence They Intend to Introduce Pursuant to F.R.E. 404(b) (ECF No. 350); Kann's Motion for Disclosure of Impeaching Information (ECF No. 346).[1]

For the reasons stated herein, the court denies the following Motions: Darji's Motion to Preclude Direct and Derivative Use of Any Telephone Calls Involving Mr. Darji Intercepted Over Target Telephone Number 813-810-7268, Defendant Darji's Motion to Suppress His Conversations on the Hazelwood Wiretap Based on Lack of Individualized Necessity, Darji's Motion for *Franks'* Hearing to Suppress Darji's Conversations Recorded Pursuant to Court-Ordered Wiretaps on Cell Phone Number 404-694-9560, Darji's Motion for a *Franks'* Hearing to Suppress Materials Seized Pursuant to Search Warrants, Hazelwood's Motion for Notice of the Government's Intention to Offer into Evidence Unlawfully Seized E-mail and to Suppress, Hazelwood's Motion for Notice of the Government's Intention to Offer into Evidence Material Seized From Hazelwood's Residence, Liddy's Motion to Suppress Statement & Request for Evidentiary Hearing, Liddy's Motion to Exclude 404(b) Evidence & Request for Evidentiary Hearing, Darji's Motion for Disclosure of Evidence That the Government Intends to Introduce Pursuant to F.R.E. 404(b), Defendant Sasaki's

---

[1] For greater clarity as to which defendant filed which motion, and which defendants joined in each motion, the court has attached a chart, as Appendix A, detailing this information.

Motion for Court to Set a Date by Which the Government Must Disclose Evidence They Intend to Introduce Pursuant to F.R.E. 404(b), and Kann's Motion for Disclosure of Impeaching Information. The court grants Defendant Liddy's Motion to Suppress Statement & Request for Evidentiary Hearing and sets a hearing for July 27, 2011 at 9:00 a.m.

## I. BACKGROUND

Defendants are charged with conduct allegedly occurring between October 2005 and February 2009. The Indictment alleges the following thirty-seven counts: (1) conspiracy to distribute controlled substance (Count I); (2) conspiracy to commit money laundering (Count II); (3) distribution of Schedule III controlled substance based on prescriptions issued outside the usual course of professional medical practice and not for a legitimate medical purpose (Counts III-XXII); (4) distribution of Schedule IV controlled substance, based on prescriptions issued outside the usual course of professional medical practice and not for a legitimate medical purpose (Count XXIII); (5) money laundering (Counts XXIV-XXXVI); and (6) engaging in continuing criminal enterprise (Count XXXVII).

Defendant Hazelwood is charged with Counts 1-37; Toennies with Counts 1-23; Barbara-Rovedo with Counts 1-23; Fernandez-Montalvo with Counts 1-18, 21, and 23; Sasaki with Counts 1 and 2; Darji with Counts 1, 3, 8, 10-11, 14-18, and 23; Liddy with Counts 1, 4, 6-7, 9, and 13; Kann with Counts 1, 3, 24-36; Ryan with Count 1; and Derks with Counts 1, 19, and 23. These charges stem from allegations that Hazelwood organized an internet "pill mill," whereby he allegedly marketed and sold Schedule III and IV prescription pills to online buyers outside the usual course of medical practice and not for a legitimate medical purpose with the help of doctors and pharmacists that he recruited to participate in the scheme. The Government contends that

Hazelwood made millions of dollars from this business and that he used offshore accounts and businesses to conceal these profits.

## II. DARJI'S MOTION TO PRECLUDE DIRECT AND DERIVATIVE USE OF ANY TELEPHONE CALLS INVOLVING MR. DARJI INTERCEPTED OVER TARGET TELEPHONE NUMBER 813-810-7268

Defendant Darji moves to preclude the Government from making any direct or derivative use of any telephone calls involving him intercepted over target telephone number 813-810-7268, pursuant to FED.R.CRIM.P. 12(b)(3)(C) and 18 U.S.C. § 2518(9).  (Mot. at 1.)  Darji has received the telephone calls recorded on this phone number, which include conversations between him and Dr. Juan Ibanez.  Darji has requested that the Government produce the wiretap applications, wiretap orders, and intercept notices for these recorded calls.  AUSA Edward Feran has not produced this information because he maintains that the Government does not intend to use those calls at trial. (*Id.*)  Darji contends that by refusing to produce this information, he has been prevented from moving to suppress his conversations intercepted over this phone number.  He asserts that the Government should not be allowed to benefit by refusing to provide the requested information. Darji also argues that 18 U.S.C. § 2518(9) "specifically bars not only intercepted wire communications but also any evidence derived from intercepted wire communications from being received in evidence or even disclosed in a trial if the defendant has not been furnished with a copy of the court order and wiretap application under which the interception was authorized." (*Id.* at 2.) Therefore, Darji maintains, the Government must be barred from making direct or derivative use of any calls involving him intercepted over the 813-810-7268 number because the Government has refused to produce the wiretap application and wiretap order.

-4-

The Government argues that Darji's Motion should be denied because his request is premature.  Section 2518(9) prohibits the admission into evidence of the contents of telephonic wire interceptions unless "each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved."  A trial date has not been set yet.  Therefore, the Government can still comply with its obligations under § 2518(a) without prejudicing Darji.

In any event, the Government represents that it does not intend to use either the direct or the derivative contents of the intercepted calls at trial.  The Government maintains that it is aware of its discovery obligations under the Federal Rules of Criminal Procedure, and will continue to supplement its discovery as necessary.  The Government contends that it has complied with its discovery obligations and provided Darji with all of the information the Government intends to present at trial.  Should it decide to use any of the evidence from the intercepted calls, the Government states that it will comply with the requirements § 2518(9), at which time Darji can challenge its admission.  Darji has not submitted a reply rebutting any of the Government's assertions.

The court finds, based on the Government's representations that it does not intend to use the direct or derivative contents of the intercepted phone calls, and the fact that a trial date has not yet been set, that Darji's Motion is premature.  Therefore, his Motion is denied.

### III. DEFENDANT DARJI'S MOTION TO SUPPRESS HIS CONVERSATIONS ON THE HAZELWOOD WIRETAP

Defendant Darji moves to suppress his conversations recorded on the court-ordered wiretap on Hazelwood's phone number, 404-694-9560.  (Mot. at 1.)  Darji contends that the initial application, the first application for continued interception, and the second application for continued

-5-

interception, fail to contain the required individualized explanations of the necessity of wiretapping him.  Darji argues that it is clear that the necessity requirement has not been met in light of the fact that the DEA investigators repeatedly inspected his pharmacies on five prior occasions and interviewed him on four prior occasions.

## A. Necessity Requirement

In order for federal law enforcement officials to conduct electronic surveillance using a wiretap, they must obtain authorization by making an application, which must include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (quoting 18 U.S.C. § 2518(1)(c)).  This is known as the "necessity requirement," which was "designed to insure that 'wiretapping is not resorted to in a situation in which traditional investigative techniques will suffice to expose the crime.'"  *Id*.  The Sixth Circuit "has clarified that the purpose of the necessity requirement 'is not to foreclose electronic surveillance until every other imaginable method has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.'"  *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977)).  A wiretap also does not have to be used as a last resort.  *Landmesser*, 553 F.2d at 20.  Congress only "intended that the showing envisioned by § 2518(1)(c) be tested in a 'practical and common sense fashion.'" *Id*.  Issuing judges must ensure that "wiretaps are not being 'routinely employed as the initial step in criminal investigation.'" *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988).  The Sixth Circuit has summarized the requirement as the following:

> [a]ll that is required is that the investigators give serious consideration
> to the non-wiretap techniques prior to applying for wiretap authority
> and the court be informed of the reasons for the investigators belief
> that such non-wiretap techniques have been or will likely be
> inadequate.

*United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985). The Sixth Circuit has stated that "[b]ecause the necessity requirement is a component of Title III, and because suppression is the appropriate remedy for a violation under Title III, where a warrant application does not meet the necessity requirement, the fruits of any evidence obtained through that warrant must then be suppressed." *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007). However, "[s]ince the issuing judge is in the best position to determine all of the circumstances in the light in which they may appear at that time, 'great deference' is normally paid to the determination of an issuing judge." *Alfano*, 838 F.2d at 162.

## B. Affidavit to Wiretap

In the instant case, the affidavits supporting the initial application, as well as the applications for continuing interception, range from 40-60 pages. Each of these affidavits include a summary of the operation of the alleged drug trafficking organization, identities of persons expected to be intercepted, summary of current investigation, pen register and telephone toll record analysis, explanation of the need for interception, prior applications, and information regarding minimization. (Wiretap Applications, ECF Nos. 266-1, 266-2, 266-3.) Within the section titled, "Need for Interception," DEA Agent Robert Cross ("Cross"), provides a detailed explanation as to why the wiretap is necessary. Cross states that "while the government can show pharmacies and others are involved in the dispensing and distribution of various drugs and collecting monies from such sales, additional evidence is needed to establish their criminal intent and knowledge that such drugs

-7-

were/are being prescribed, dispensed, and distributed without a legitimate medical basis." (Initial

Wiretap Application Aff. ¶ 73, ECF No. 266-1.) Cross states that the goal of the wiretap is to obtain

information on the specifics of the offense described within the affidavit, which should include

> (i) the nature, extent, and methods of drug trafficking, including courier methods and locations, storage locations, and concealment techniques and efforts of the target interceptees; (ii) the nature, extent and methods of operation of the business of the target interceptees and others, including the dates, times, places, and manner of delivery of illegal drugs, as well as their knowledge, criminal intent, and roles; (iii) the identities and roles of sources of supply, accomplices, customers, aiders and abettors, co-conspirators and participants of the named interceptees in their illegal activities; (iv) the location, distribution, and transfer of the contraband and money in those illegal activities; (v) the existence and location of records, in particular invoices, distribution records, purchase records and dispensation records, associated with illegal activity; (vi) the location and source of resources used to finance their illegal activities; (vii) the location and disposition of the proceeds from those illegal activities; (viii) the extent of the criminal organization in which the target intercepts participate; and (ix) the locations of items used in furtherance of those illegal activities.

(*Id*. at ¶ 5(c).) Cross then provides a breakdown of the alternative investigative techniques that they

have tried and failed, reasonably appear to be unlikely to succeed if they were tried, or were too

dangerous to use. (*Id*.)

### 1. Physical Surveillance

Cross contends that "physical surveillance is difficult to conduct, of limited value, and will

not serve as a viable alternative to the interception sought for several reasons." (*Id*. at ¶ 74.) These

reasons include the inherent nature of the Internet and the fact that "nearly all of the Hazelwood

DTO's operation is based on telephone, facsimile, or internet transactions." (*Id*.) Therefore,

physical surveillance would have little value since there is not much physical interaction between

the co-conspirators. Cross also asserts that physical surveillance is of limited value because "it does

not adduce the evidence necessary to accomplish the legitimate goals of the investigation," and had not succeeded in gathering sufficient evidence in the investigation.  (*Id*. at ¶ 75.)  Additionally, Cross contends "physical surveillance is unlikely to establish the knowledge, roles, and functions of the target subjects; to identify additional conspirators and/or their knowledge, roles, and functions; or to otherwise provide admissible evidence in regard to this investigation." (*Id*. at ¶ 76.)

### 2. Use of Grand Jury Subpoenas

After discussing grand jury subpoenas with AUSA Rebecca Lutzko ("Lutzko"), Cross believes that they also will not be successful in achieving the goals of the investigation.  (*Id*. at ¶ 77.)  Cross contends that "[i]f any principals of the conspiracy, their co-conspirators, and other participants were called to testify before the Grand Jury, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify." (*Id*.)  Cross believes that it would be unwise to provide any of these people with immunity, since it might prevent the prosecution of the most culpable people, and it could not be guaranteed that even if immunized, testimony elicited from them would be truthful.  (*Id*.)  Cross maintains that if principals of the conspiracy or their co-conspirators were served with grand jury subpoenas, it would alert them to the existence of the investigation, and "cause them to become more cautious in their activities, flee to avoid further investigation or prosecution, or to otherwise compromise the investigation." (*Id*.)  Cross states that he and Lutzko have considered subpoenaing certain individuals involved in the Hazelwood DTO, but believe that they would not be truthful if subpoenaed, and "would seek to minimize their own roles and their associated criminal culpability." (*Id*.)

### 3. Confidential Informants and Cooperating Sources

Cross provides detailed information regarding the confidential informant and the source of information that have provided information on the Hazelwood DTO to the Government.  (*Id.* at ¶ 78.)  Although this information is valuable, Cross contends that "it does not include information about many aspects of the organization at the level targeted in this investigation and specifically in this application for authorization to intercept communications." (*Id.*)   For instance, the source of information is a pharmacist who filled prescriptions for the organization for a brief period, but did not have access to the larger organization and did not have access to the target telephone calls, or any other communications of the Hazelwood DTO.  (*Id.*)  This person also was not in a position to meet with other people in the organization or identify others, and would not be aware of their knowledge, roles, or functions.  (*Id.*)  Similarly, the confidential informant made inquiries about joining the organization, but did not do anything further, and cannot get any additional information, since joining the organization would require him to illegally supply drugs.  (*Id.* at ¶ 79.)  Further, if the confidential informant were to call Hazelwood, Hazelwood would likely view the call as suspicious, as two months had passed since their last contact.  (*Id.*)  Cross also maintains that it is unlikely that the confidential informant could successfully infiltrate the organization to the degree necessary to obtain the information the Government seeks through the wiretap application.  (*Id.* at ¶ 80.)  These reasons are also why additional confidential sources have been rejected as a means to accomplish the goals of this investigation.  (*Id.* at ¶ 81.)

### 4. Undercover Agents

The Cleveland DEA has made numerous undercover drug buys from the Hazelwood DTO, but these buys only provided limited information on the organization.  (*Id.* at ¶ 82.)  Cross contends that neither the confidential informant, nor the source of information, are in a position to be able to

introduce an undercover agent to the members of the Hazelwood DTO that would allow the agent to effectively infiltrate the organization.  (*Id*. at ¶ 83.)  Also, joining would require the agent to be involved in the illegal distribution of drugs to the public.  (*Id*.)  In addition, specialized skills would likely be required, as certain members must possess skills of professionals such as medical professionals, healthcare administrators, pharmacists, and certified public accountants.  (*Id*.)  Therefore, using an undercover agent "would greatly increase the risk of exposure and increase the possibility of failure."  (*Id*.)

### 5. Interviews

The affidavit also states that the investigators have interviewed a pharmacist who previously filled Internet prescription orders for the Hazelwood DTO.  (*Id*. at ¶ 84.)  Although this information was valuable, it was "not sufficient to establish, conclusively, the knowledge, roles, and functions of the various conspirators, the identities of all those involved in the organization, the financial operations, the location of records, and other pertinent information regarding the targeted criminal activity."  (*Id*.)  Cross contends that the only other people with relevant information who could be interviewed are those "actively engaged in the internet drug trafficking activities," and that interviews of those subjects or their known associates "would produce insufficient information, if any, as to the identities of all of the persons involved in the conspiracy, the roles of the conspirators, the financial operations, the location of records, and other pertinent information regarding the targeted criminal activity."  (*Id*. at ¶ 85.)  Cross believes that "any responses to any interviews conducted at this time would contain a significant number of untruths, diverting the investigation with false leads or otherwise frustrating the investigation."  (*Id*.)  Cross also notes that "in the

absence of criminal charges, the subjects of the investigation and others would have no real incentive to cooperate or provide truthful answers to case agents." (*Id.*)

### 6. Search Warrants

The affidavit also states that the execution of search warrants have been considered, but are unlikely to "yield documents that would establish the total scope of the illegal operation, the identities of all involved conspirators, or their requisite knowledge and criminal intent." (*Id.* at ¶ 87.) Cross also states that it is unlikely that many of the principals of the organization, or records of the organization, would be at any one location where the search warrant was executed. (*Id.*) Since the organization is Internet-based, "[m]ost of the transactions, orders, and shipments all utilize the electronic communications, email, digital transfer of information, possible off-site electronic storage, and to some extent, internet and web-based communications." (*Id.*) Therefore, warrants "would not be effective in acquiring all the information necessary to identify all the conspirators and their respective roles within the organization." (*Id.*) Cross also believes that search warrants executed at that time would be more likely to compromise the investigation since it would alert the principals to the investigation and "allow[] other unidentified members of the conspiracy to insulate themselves further from successful detection." (*Id.* at ¶ 88.)

### 7. Trash Retrievals

The affidavit states that agents have attempted to retrieve trash from the organization's call center, Delta Health, but these efforts have been unsuccessful since this business is located in a small business complex, in an office building next to three other businesses. (*Id.* at ¶ 89.) Agents cannot engage in daytime retrieval because of the dumpster's proximity to Delta Health's office. In addition, because all four businesses share a publicly open trash dumpster, it is nearly impossible

-12-

to determine which trash belongs to Delta Health.  Further, because the Hazelwood DTO is Internet-based, "relevant paper documents and other physical trash is minimized since records, invoices, receipts, and documents are managed in electronic fashion and are stored in electronic storage devices such as computer hardware, network servers and electronic storage drives."  (*Id.* at ¶ 90.)  Therefore, trash searches "do not appear to be a feasible means of advancing the investigation."  (*Id.*)

### 8. Pen Registers/Telephone Call Records/Traps and Traces

The affidavit also states that the investigation involved pen registers, trap/trace devices, and telephone records.  (*Id.* at ¶91.)  Valuable information has been provided from these devices, but do not record the identities of the parties to communications, cannot identify the nature, substance, or content of the communication, and cannot differentiate between e-mails for legitimate and criminal purposes.  These devices only record "internet protocol (IP) numbers, websites visited, and sender/recipient information of email correspondence, and nothing further."  (*Id.*)  The telephone records have also produced valuable information regarding frequent phone calls between the target telephone number and other numbers, but only provide information regarding the telephone numbers  called to and from the target telephone number, and do not identify the substance and content of the communications.  (*Id.* at ¶ 92.)

The extension applications similarly contain significant detail regarding developments in the investigation since the previous application, as well as new information learned as a result of the previous wiretap.  The Government also provides an explanation as to why an extension is needed to further its investigation.

-13-

## C. Analysis

Darji contends that neither the DEA's multiple inspections of his pharmacies, nor his multiple interviews were included in the affidavit under the section of alternative investigative techniques, despite the DEA's knowledge of such interviews and inspections.  Darji argues that these omissions in the initial wiretap application, as well as the two additional applications for continued interceptions, demonstrate the Government failed to comply with its statutory obligation to factually justify why wiretap interception was necessary as to him personally.  (Mot. at 6.)  He also asserts that the Government failed to inform the issuing judge that Darji had never refused to be interviewed by the DEA investigators and that the DEA had the ability to inspect his pharmacies anytime without prior notice.  Darji argues these failures need to be viewed as misleading, and therefore the issuing judge's decision to authorize the wiretap is not entitled to any deference.  Darji argues that this court must determine if the Government failed to meet the statutory necessity requirement to justify including Darji as a wiretap target.  Darji alleges that *Rice*, 478 F.3d at 708-09, demonstrates that "a wiretap affidavit such as this one which made no reference to any facts about why normal investigative techniques used against Vinesh Darji personally would be ineffective or dangerous cannot possibly meet the Title III requirement."  (Mot. at 7.)  Darji maintains that the Government did not meet the necessity requirement, and therefore his intercepted conversations must be suppressed.

The Government argues that Darji's prior discussions with the DEA years before this investigation do not undermine the Affiant's belief that interviews would be unsuccessful.  (Resp. at 6, ECF No. 302.)  The Government contends that the prior DEA interviews were administrative in nature, and were not part of a criminal investigation.  By the time of the wiretap application

-14-

though, there was a criminal investigation into the legitimacy of Darji's pharmaceutical activities. The Government asserts that it was reasonable for the Affiant to believe that though Darji had been cooperative with the DEA on general administrative matters regarding his registrant status that he was likely to be untruthful or uncooperative regarding an investigation of him in regard to criminal matters.

The court finds the Government's arguments to be persuasive.  The Government included detailed affidavits in support of its initial wiretap applications and applications for continuing interception.  The Affiant does not make conclusory statements as to why alternative investigative techniques proved unsuccessful, but instead provides detailed reasoning as to how the circumstances of this particular investigation make such techniques unsuitable or unsuccessful.  The Affiant explains that subpoenas to the grand jury would likely be unsuccessful because people would be untruthful and seek to limit their own role to avoid culpability.  He explains how search warrants would likely be unsuccessful because people and records would not be in one location and the nature of an Internet business means most documents would not be kept in a hard copy.  He further explains the limited role that sources can provide, as they cannot identify all people within the conspiracy, and lack access to much of the information sought in the investigation.

The fact that Darji had previously been willing to speak with the DEA and allow his pharmacies to be searched without prior notice does not change the Affiant's conclusions.  The letters Darji includes from his counsel indicate that the inquiries by the DEA in November of 2005 and January of 2006 were administrative in nature.  (Letters, ECF Nos. 266-4, 266-5.)  The initial application for the wiretap is dated April 18, 2007.  Darji's interests during administrative inquiries would be markedly different from those in regard to a criminal investigation.  While Darji may have

-15-

been willing to speak with the DEA agents previously in regard to different matters, it is reasonable for the Affiant to conclude that it was unlikely he would have freely and truthfully spoken with agents regarding their criminal investigation of him.  The same would be true of a grand jury subpoena.  Affiant's concerns that Darji, or any other subject of their investigation, might be less than truthful if questioned, were reasonable.  Further, as Affiant stated, had Darji been questioned sooner, he may have frustrated the Government's investigation by alerting other members of the conspiracy of such investigation.  Therefore, it was necessary to include Darji in the wiretap interception.

Darji's arguments regarding the Government's omissions of his interviews in the wiretap applications are similarly unavailing.  Those discussions were not directly relevant to the criminal investigation.  His interviews centered generally on his activities regarding guidelines for Internet distributions as a registrant.  Therefore, those interviews are not indicative of whether or not he would be uncooperative or untruthful in a criminal investigation.

Darji's reliance on *Rice* is misplaced.  *Rice* did not hold that the necessity stated in an electronic interception has to specifically mention a particular target of the interception and why particular investigative techniques have failed as to that target.  Instead, the Sixth Circuit in *Rice* held that the district court did not commit clear error in determining that the affiant's statements were misleading or made recklessly in violation of Title III.  478 F.3d at 707-11.  The Sixth Circuit indicated that the affidavit only contained generalized statements regarding alternative investigative techniques.  *Id.*  The district court and the Sixth Circuit took issue with the failure of the affiant to state with particularity as to that investigation why alternative investigative techniques would not have been useful.  *Id.*  The affidavit here, does not suffer from similar deficiencies.  The Affiant has

included significant details explaining why alternative investigative techniques have been or would be unsuccessful.

The purpose of the necessity requirement "'is not to foreclose electronic surveillance until every other imaginable method has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.'" *Corrado*, 227 F.3d at 539. The Government did not have to attempt to interview Darji regarding the criminal investigation, or specifically explain why interviews with him would be unsuccessful. Congress only "intended that the showing envisioned by § 2518(1)(c) be tested in a 'practical and common sense fashion.'" *Landmesse*r, 553 F.2d at 20. Issuing judges must ensure that "wiretaps are not being 'routinely employed as the initial step in criminal investigation.'" *Alfano*, 838 F.2d at 163. It is clear that a wiretap was not the first step in this investigation, and many other techniques were considered and/or tried. The Government provided an extensive explanation as to how alternative techniques in this investigation were simply inadequate. The "mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance." *Stewart*, 306 F.3d at 305.

Section 2518(1)(c) requires the Government to make a showing that alternative investigative techniques "reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The Government's in-depth explanations meet this standard and are more than adequate to demonstrate that alternative techniques would be unsuccessful if tried. Therefore, the court does not believe the issuing judge abused his discretion in granting the Government's initial application for a wiretap, nor when he granted the Government's extension applications. Accordingly, Darji's Motion to Suppress is denied.

-17-

## IV. DARJI'S MOTIONS FOR FRANKS HEARINGS

Defendant Darji moves for a hearing, pursuant to *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978) to challenge the admissibility of conversations recorded between him and Hazelwood pursuant to court-ordered wiretaps on cellular telephone number 404-694-9560 subscribed to by Hazelwood.  (ECF No. 267.)  Darji also moves for a hearing, pursuant to *Franks*, to challenge the validity of the search warrants executed on his pharmacies and business office at Ashkar Chemists, Inc. d/b/a The Medicine Shoppe, 10905 North Nebraska Avenue, Tampa, Florida 33612; Vin-Kash, Inc. d/b/a Alliance Specialty Pharmacy, 5474 Williams Road, Suite 1B, Tampa, Florida 33620; Vin-Kash, Inc., 5474 Williams Road, Suite 1A, Tampa, Florida 33610; and Vin-Kash, Inc., 5474 Williams Road, Suite 2A, Tampa, Florida 33610.  (ECF No. 268.)  Darji contends that the DEA made several omissions in its affidavits supporting its wiretap applications and search warrants which were necessary to finding probable cause as to him.  He contends he has made the proper showing and he is therefore entitled to a *Franks*' hearing.

### A. Franks Standard

The Supreme Court held in *Franks* that

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

-18-

*Id.*  A defendant must "must accompany his allegations with an offer of proof," such as through supporting affidavits, or explaining their absence.  *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990).

The Sixth Circuit has held that the *Franks* doctrine also applies to omissions of information from affidavits.  *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998).  However, the Sixth Circuit noted that a *Franks* hearing is only merited in rare instances when omissions of information are at issue.  *Id.*  The Sixth Circuit held that "[a]lthough material omissions are not immune from inquiry under *Franks*, we have recognized that an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information."  *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997).  The reason for this is that "an allegation of omission 'potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit.'"  *Id.* (internal citation omitted).  The *Mays* court noted that "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation."  134 F.3d at 815.  Therefore,

> the defendant is entitled to a hearing if and only if: (1) the defendant makes a substantial preliminary showing that the affiant engaged in deliberate falsehood or reckless disregard for the truth in omitting information from the affidavit, and (2) a finding of probable cause would not be supported by the affidavit if the omitted material were considered to be a part of it.

*United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008).  The Sixth Circuit clarified that "except in the *very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is critical

-19-

to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts."  *Mays*,
134 F.3d at 816.

## B. Analysis

### 1. Omissions of Florida Law

#### a. Wiretap

As a Florida pharmacist, Darji acknowledges that both Florida and federal law governed his
activities as a pharmacist.  At the time the affidavits were submitted to the court, Darji maintains
that the Controlled Substances Act, 21 U.S.C. § 841 et seq. ("CSA"), did not define how
pharmacists would know what a "valid prescription" was, and did not inform them how to determine
if a doctor issued the prescription for a "legitimate medical purpose."  Therefore, Darji asserts, the
Government had to tell the issuing judge about the existing state of Florida law governing
pharmacists filling controlled substances prescriptions, in order for the judge to perform the
individualized necessity evaluation regarding him. Darji argues that Florida law only prohibits
prescribing medications based solely on an electronic medical questionnaire, and the Government
omitted this information.  He contends that he believed the prescriptions he was given were based
on medical records given to the prescribing doctor.  He also states that the DEA omitted that Florida
law permits doctors other than the prescribing physician to perform the required patient evaluation.
In addition, Darji asserts that the Government omitted Florida Administrative Code § 64B16-
27.831, which lists five specific criteria that should make a pharmacist question whether a
prescription was issued for a legitimate medical purpose.  Darji maintains that none of the criteria
caused him to question prescriptions, and even if they should have, he still complied with this
section, since he often obtained patient photo identification and medical records from Delta Health.

-20-

However, Defendant misunderstands his obligations.  He needed to comply with Florida state law and federal requirements stated within the CSA.  Darji's compliance with Florida law does not demonstrate compliance with the CSA.  Section 841 of the CSA provides: "it shall be unlawful for any person knowingly or intentionally – (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance."  The CSA contains an exception to the broad prohibition on the distribution of controlled substances for physicians and pharmacists.  Pursuant to 21 C.F.R. § 1306.04(a), a controlled substance may only be prescribed and dispensed "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  A prescription is invalid if it is not issued for a legitimate medical purpose. If a pharmacist knowingly fills an invalid prescription, through actual knowledge or deliberately closing his eyes to wrongdoing that should have been obvious to him, he has distributed a controlled substance illegally.  *United States v. Veal*, 23 F.3d 985, 988 (6th Cir. 1994) (internal citation omitted).

Defendant reiterates the arguments he raised in his Motion to Dismiss (ECF No. 270), contending that it was not clear what was meant by a "valid prescription."  Darji argues that this is why it was important for the issuing judge to know the definitions provided by Florida law. However, Defendant is mistaken.  As the court stated in its Order denying Darji's Motion (ECF No. 382), the exemptions to the CSA for legitimate prescriptions require prescriptions to be issued in the usual course of professional practice for a legitimate medical purpose. 21 CFR § 1306.04. Whether prescriptions meet this standard is  up to a jury, and is made on a case-by-case basis, evaluating the circumstances surrounding the issuing of the prescriptions.  *See United States v. August*, 984 F.2d 705, 713 (6th Cir. 1992).  Some factors include inadequate and/or perfunctory

-21-

physical examinations of the patient, *see e.g., United States v. Russell*, No. 96-2128, 1998 WL 136574, at *1 (6th Cir. Mar. 19, 1998); *United States v. Zwick*, 413 F. Supp. 113, 115 (N.D. Ohio 1976); substantially similar treatment, *see e.g., Russell*, 1998 WL 136574 at *1; *United States v. Lawson*, 682 F.2d 480, 482-83 (4th Cir. 1982); *United States v. Fuchs*, 467 F.3d 889, 909 (5th Cir. 2006); large number of prescriptions by a single doctor, *see e.g., Lawson*, 682 F.2d at 482; *United States v. DeBoer*, 966 F.2d 1066, 1068-69 (6th Cir. 1992);and the types of drugs distributed, *see e.g., United States v. Hughes*, 895 F.2d 1135, 1138 (6th Cir. 1990); *Lawson*, 682 F.2d at 483.

Florida's regulations do not substitute or alter Darji's obligations in regard to his compliance with federal regulations. Darji must fill only valid prescriptions to be in compliance with the CSA, and must also ensure he meets Florida regulations. Darji contends the wiretap applications allege there was probable cause to believe he was filling prescriptions for controlled substances, prescribed by a doctor that lacked a legitimate doctor-patient relationship, but Florida law only prohibited "[p]rescribing medications based solely on an electronic questionnaire." FLA. ADMIN. CODE ANN. r. 64B8-9.014(1). Darji contends he thought the prescriptions were based on medical records. Florida's limited explicit prohibition does not mean that all other prescriptions are automatically valid. As indicated above, there are other factors that indicate that prescriptions are outside the course of professional practice and not for a legitimate purpose. The same is true in regard to the five specific things Florida regulations list that "should cause a [Florida] pharmacist to question whether a prescription was issued for a legitimate medical purpose." FLA. ADMIN. CODE ANN. r. 64B16-27.831. The five factors are:

> (1) Frequent loss of controlled substance medications, (2) Only
> controlled substance medications are prescribed for a patient, (3) One
> person presents controlled substance prescriptions with different
> patient names, (4) Same or similar controlled substance medication is

-22-

> prescribed by two or more prescribers at the same time, (5) Patient
> always pays cash and always insists on brand name product.

*Id*.  However, these are not the only factors that should make a pharmacist question whether a

prescription is valid.  The fact that Darji complied with this section by obtaining copies of the

driver's license most of the time when he questioned a prescription, as required by 64B16-27.831,

does not mean that this relieves Darji of his responsibility to ensure he complied with Federal law,

and fill only valid prescriptions as required by the CSA.  Furthermore, two of these factors

demonstrate that Darji should have questioned the legitimacy of the prescriptions: only controlled

substances were prescribed for the patients (later, always a noncontrolled substance with a

controlled substance) and the patients always paid in cash.  Therefore, rather than reducing support

for probable cause, this regulation would bolster the Government's claims.

Darji has failed to make a substantial preliminary showing that the Affiant had a reckless

disregard for the truth in omitting information from the affidavit.  The information Darji claims was

omitted did not need to be included.  Florida regulations are not at issue.  Even if this information

had been included, it would not have negated probable cause.  The significant information included

in the affidavit demonstrates that there was probable cause to believe Darji was violating federal

law.  The affidavit states that 10 of the 17 allegedly illegal undercover purchases made by the

Cleveland DEA were filled by Darji's pharmacies. (Initial Wiretap Application Aff. ¶¶ 27-28.) One

of the purchasers, Park Rover, submitted fictitious medical records of a dog, which included dog

ailments such as "Discomfort from falling-prescription for hydrocodone, Experiencing bad heart

worms-Excessive barking." (*Id*. at ¶ 29.)  Based on the dog's records, he received 269 tablets of

hydrocodone, some of which filled by Darji's pharmacies.  Darji also received approximately

$120,000 through checks written by Hazelwood in December of 2006.  (*Id*. at ¶ 37.)  This

information, along with the additional information contained in the affidavit, demonstrates there was sufficient probable cause to believe that Darji was distributing controlled substances without a valid prescription.

Darji's arguments regarding compliance with Florida law demonstrating his intent to abide by the law can be made at trial, but are not relevant to whether there was probable cause at the time the wiretap application was submitted to the issuing judge.  The Sixth Circuit has stated that "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation."  *Mays*, 134 F.3d at 815.  Furthermore, the Sixth Circuit has stated that only in rare circumstances is a *Franks* hearing warranted in regard to omitted information.  The Sixth Circuit clarified that "except in the *very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to mislead* excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable to the omission of disputed facts."  *Mays*, 134 F.3d at 816.  Darji has neither made a strong preliminary showing that he is entitled to a hearing nor proven that any omissions were made with the intent to mislead.  He has not presented any evidence to demonstrate the alleged omissions were intentionally misleading, and does not explain why this court should consider them to be misleading.  Therefore, Darji's Motion is denied on this basis.

### b. Search Warrants

Darji is challenging the affidavit contained within search warrants issued by a magistrate judge in the Middle District of Florida.  The search warrants did not involve the alleged scheme with the Hazelwood drug trafficking organization, but instead were regarding a different scheme where controlled substances were dispensed through Internet websites without valid prescriptions.

-24-

Darji was one of the individuals named in the search warrants, thought to be conspiring with several individuals to distribute such controlled substances.  Thus, this aspect of Darji's Motion involves the affidavit submitted in support of the Florida search warrant, as opposed to that discussed above. The court concludes that Darji is unable to make the necessary showing to warrant a *Franks* hearing in regard to the Florida search warrant.  As stated above, Darji was required to be in compliance with Federal regulations and Florida law.  The fact that he complied with Florida regulations does not necessarily demonstrate compliance with Federal regulations, and Florida regulations cannot replace his obligations under the CSA.  Further, as was true regarding the scheme at issue in the Hazelwood case, the scheme at issue in the search warrants  involved only prescribing controlled substances to patients, which under Florida law, was an indicator that the prescription may not have been for a legitimate medical.  Therefore, the inclusion of Florida law would provide greater support for probable cause rather than diminish it.

Darji has failed to make a substantial preliminary showing that the Affiant had a reckless disregard for the truth in omitting information from the affidavit supporting the search warrants. The information Darji claims was omitted did not need to be included.  Florida regulations are not at issue.  Even if this information had been included, it would not have negated probable cause.  The significant information included in the affidavit demonstrates that there was probable cause to believe Darji was violating federal law.  The affidavit stated that customers complete online questionnaires and sometimes fax medical records, but the information is never verified, before controlled substances are prescribed. (Search Warrant Aff. ¶ 26, ECF No. 268-1.)  One undercover buy included in the affidavit indicated that a purchase of hydrocodone was made without any phone consultation occurring with any medical professional prior to the receipt of the drugs.  (*Id*. at ¶ 37.)

No medical records were provided to the website, physician, or pharmacy either. (*Id*.) The affidavit also demonstrated that Darji's pharmacies filled prescriptions for controlled substances significantly higher than the national average. (*Id*. at ¶ 57.) The average yearly total was about 90,000 dosage units in 2006. One of Darji's pharmacies prescribed about 1.6 million dosage units, and another prescribed about 3.2 million dosage units in 2006. (*Id*.) In addition, Darji's corporations received about $75,000 between June and December of 2006 from corporations controlled by one of his alleged co-conspirators. (*Id*. at ¶ 61.) Further, certain intercepted phone calls referenced in the affidavit indicate that Darji was concerned about compliance with DEA requirements, and that he would shift some of the purchases from one of his pharmacies to another. (*Id*. at ¶ 42.) This information within the affidavit demonstrated there was probable cause to believe that Darji was filling invalid prescriptions, prescriptions issued outside the course of professional practice and not for a legitimate medical purpose. Again, Darji has failed to make a strong preliminary showing that he is entitled to a *Franks* hearing on this basis, or that the omitted information was excluded with the intent to mislead. Therefore, his Motion must be denied on this basis also.

2. Omissions Regarding Darji's Good Faith and Lack of Criminal Intent

Darji's arguments regarding the omissions of his good faith and lack of criminal intent, through his representation by an attorney, who engaged in discussions with the DEA, similarly fail to make a substantial showing or demonstrate a lack of probable cause in regard to both the wiretap applications and search warrants. Darji contends that had the issuing judge been aware that he had been in discussions with the DEA and indicated to it that he believed Internet prescriptions were legal, the issuing judge would not have found probable cause. However, this is an affirmative defense, which the Government was not obligated to raise at the time of its wiretap application and

its extensions.  Further, the Sixth Circuit has stated that a warrant application is not required to include all potentially exculpatory evidence, since it would place an extraordinary burden on law enforcement officers.  *Mays*, 134 F.3d at 816.  Officers would be compelled

> to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded.  Under such a scenario, every search would result in a swearing contest with participants, arguing after the fact over whether exculpatory evidence even existed.

*Id*.  Therefore, the Affiant was not required to include the advice of counsel, and the discussions Darji had with the DEA.

Even if this information were included in the affidavit, it still would not have negated probable cause.  Darji's statements regarding his beliefs that the Internet prescriptions were legal would have been outweighed by the information provided in the affidavits, including false medical records, large amounts of controlled substances filled by Darji's pharmacies, and the significant amounts of money received by Darji. This information within the affidavit demonstrated there was probable cause to believe that Darji was filling invalid prescriptions, prescriptions issued outside the course of professional practice and not for a legitimate medical purpose.

Darji also makes an argument regarding the date used in the search warrant affidavit regarding a meeting the DEA had with Darji's counsel.  In paragraph 51, the Affiant states that the DEA Investigator, Deborah Butcher, went to one of Darji's pharmacies in July of 2006, and conducted an on-site inspection, during which Darji verified that 100% of his business at his Medicom RX pharmacy were Internet prescriptions.  The DEA requested a meeting with Darji as a result of the inspection, and at the meeting, Darji's attorney stated that Darji would quit filling Internet prescriptions if that was what the DEA wanted.  The DEA reiterated concerns raised

-27-

previously regarding whether the Internet prescriptions were valid prescriptions.  The paragraph ends with a statement that it was unclear whether Darji actually quit filling Internet prescriptions.  The chart in paragraph 54 of the affidavit to the search warrant indicates that Medicom RX pharmacy continued to fill significant amounts of controlled substances following the alleged meeting in July of 2006.  Darji contends these statements created the false impression that Darji lied to the DEA by falsely promising to stop filling Internet prescriptions.  However, he maintains that there was no meeting in July of 2006, but actually in July of 2007, ten days before search warrants were executed.  Darji asserts that "DEA's reckless re-writing of history created the entirely false impression that [he] had deliberately lied to DEA due to his consciousness of guilt."  (Mot. at 10, ECF No. 268.)  Even if this court were to conclude that the affidavit contained an erroneous date regarding the DEA's meeting with Darji, it would not have negated the finding of probable cause.  The fact that he later chose not to fulfill Internet prescriptions would not affect the finding of probable cause regarding the issuance of illegal prescriptions earlier.  The Affiant provided the issuing judge with significant information to support the court's determination that there was probable cause to believe that evidence of an earlier crime would be found at his pharmacies.  The inclusion of this omitted information would not change that result.  Therefore, Darji has failed to demonstrate that the inclusion of the alleged omissions would negate the finding of probable cause.

Defendant also makes similar arguments to those raised in his Motion to Suppress (ECF No. 266), regarding the judge needing to perform an individualized necessity evaluation regarding him in order to intercept calls involving him on Hazelwood's phone.  He contends that the omissions in the affidavit in support of the wiretap would have prevented the judge from finding probable cause as to him.  However, as stated above, despite Darji's continued reliance on *Rice*, the court did not

hold that the necessity stated in an electronic interception has to specifically mention a particular target of the interception and why particular investigative techniques have failed as to that target. To issue the order for interception, there must be probable cause to believe that evidence of criminal activity would be obtained through interception of a particular phone number.  As described in detail above, the Affiant provides a detailed account as to why the Government believes that such evidence would be obtained through interception of Hazelwood's phone.  There was significant evidence provided in the affidavits to demonstrate the interception of calls on Hazelwood's phone would obtain evidence of criminal activity.  Therefore, even had the information Darji alleges was omitted been included in the affidavit, there would still have been enough information for the judge to have found probable cause to believe that evidence of criminal activity would be obtained through interception of Hazelwood's phone.

### 3. Information Issuing Judge Would Want to Know

#### a. Wiretap

Darji contends that this is information an issuing judge would want to know, relying on a case from the Third Circuit and one from the Eighth Circuit for support.  *See Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000), quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993). However, the Sixth Circuit has never articulated such a requirement in regard to the information which must be included in an affidavit.  Therefore, Darji's arguments on this point are unpersuasive.

#### b. Search Warrants

Darji also argues that since the Affiant cites numerous sources lacking the force of law including, DEA guidelines, American Medical Association guidance, Federation of State Medical Boards Model Guidelines, a judge would have wanted to know about Florida law regarding this area

of law. However, as stated above, the Sixth Circuit has never articulated such a requirement in regard to the information which must be included in an affidavit. Therefore, Darji's arguments on this point are unpersuasive. Further, an affiant is not required to include every piece of information gathered in the course of an investigation. *Mays*, 134 F.3d at 815.

As Darji has failed to meet his burden, both of his Motions for a *Franks* hearing are denied in their entirety.

### V. HAZELWOOD'S MOTIONS FOR NOTICE OF THE GOVERNMENT'S INTENTION TO OFFER INTO EVIDENCE MATERIALS SEIZED FROM HAZELWOOD'S RESIDENCE AND UNLAWFULLY SEIZED EMAIL

Pursuant to FED. CRIM. R. 12(b)(4)(B), Hazelwood moves the court to order the Government to provide notice of its intention to offer into evidence material that was seized from Hazelwood's residence and unlawfully seized e-mail. (ECF Nos. 323, 327.) Hazelwood also seeks an extension of time in order to allow him time to file motions to suppress. Hazelwood contends that the Government has represented that Toennies's e-mail account was the only one on which search warrants were executed. However, since there are numerous e-mails referenced in the Indictment, Hazelwood asserts that it is unclear whether any e-mails were seized without a warrant. Hazelwood states that is also unclear which items, from his residence, in the massive amount of discovery produced, that the Government intends to offer at trial.

The Government argues that it has provided Hazelwood with all of the evidence to which he is entitled. FED. CRIM. R. 12(b)(4)(B) states:

> [a]t the arraignment or as soon afterward as practicable, the defendant may, in order to have an opportunity to move to suppress evidence under Rule 12(b)(3)(C), request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that defendant may be entitled to discover under Rule 16.

The Government contends that it has provided all the discovery Hazelwood is entitled to under Rule 16.  The Government maintains that it has even made individual copies of certain physical and computer evidence seized from Hazelwood's residence that it deemed pertinent, which would indicate to Hazelwood what evidence would be used in its case-in-chief.  In addition, the Government states that all evidence it has seized was in accordance with the Fourth Amendment, and any electronic correspondence retrieved was the result of either the search warrant executed on Toennies's account or of Hazelwood's co-defendants' computers.  As a result of this assertion regarding electronic correspondence, Hazelwood requests that the court deny without prejudice as moot, his Motion for Notice of the Government's Intention to Offer into Evidence Unlawfully Seized E-mail, with the right to move to suppress at a later date if the Government's representation proves untrue.

The court finds the Government's arguments to be well-taken.  It has indicated that it has provided all of the discovery Hazelwood is entitled to under Rule 16, as well as identified particular pieces of evidence seized from his residence as pertinent.  The Government will be required to identify specific evidence it intends to use at trial in accordance with deadlines set by the court in regard to trial preparation.  However, at this time Hazelwood is not entitled to specifics such as exhibit lists  or any other information precisely identifying the evidence the Government will use at trial, which would provide Hazelwood with more specific discovery than Rule 16 requires.  Therefore, Hazelwood's Motion is denied.

## VI. LIDDY'S MOTION TO SUPPRESS STATEMENT & REQUEST FOR EVIDENTIARY HEARING

Defendant Liddy moves the court to suppress evidence he alleges was unlawfully obtained in violation of his Fifth Amendment rights and requests an evidentiary hearing on his Motion.  (ECF

No. 324.) Liddy contends that the statements obtained by agents, during the execution of a search

warrant, were in violation of his privilege against self-incrimination, and therefore must be

suppressed.  Liddy alleges the following represents his account of the execution of the search

warrant:

> On July 30, 2007, a search warrant was executed at Liddy's Pharmacy located at 4204 S. Florida Ave, Suite D, Lakeland Florida, by agents of the DEA, HHS and Lakeland, Florida Police. The agents applied for a search warrant to obtain evidence related to the alleged unlawful dispensing of controlled substances in violation of the Controlled Substances Act, 21 USC 841et seq. As the application for a search warrant makes clear, Mr. Liddy and his business, Liddy's Pharmacy, were specific targets of the agents' criminal investigation (Exhibit B, Search Warrant Application).
>
> The agents entered the premises, locked the front door and posted a Lakeland Police officer at the door to prevent anyone to enter or exit the premises. The individuals present included Mr. Liddy, his wife, several employees, and his son, Kyle Liddy. The individuals were separated by agents and escorted, under the agents' direction and control, to areas within the pharmacy. Mr. Liddy was escorted by several agents to an office with a guard posted at the door to prevent him from leaving the office.
>
> Mr. Liddy and the other individuals were told they were not free to leave until they were questioned. This fact was demonstrated when Melinda Liddy requested that Kyle Liddy be permitted to leave the premises. The agents initially refused to let Kyle Liddy leave until it was proven to their satisfaction that he was not an employee or individual who could provide information that would advance their investigation. Upon being satisfied that Kyle Liddy was not an employee, he was escorted by an agent to the parking lot, and the front door to Liddy's Pharmacy was again locked.
>
> Mr. Liddy was detained in an office located by the front of the pharmacy. Two agents began to question Mr. Liddy about a host of topics including the dispensing of controlled substances via the internet, his relationship with physicians, the number and types of controlled substance medications dispensed, his understanding of the legality of his pharmacy operations, whether he believed a face to face interaction was required for the issuance of a controlled substance prescription and his relationship with companies engaged in forwarding prescriptions to his pharmacy from physicians through the internet. At no time did agents apprise Mr. Liddy that he did not have

-32-

to answer their questions, that he could remain silent or that he could consult with an attorney. He was not apprised of Miranda warnings and Fifth Amendment rights by any means.

After being interrogated in an initial session lasting approximately 30 – 45 minutes, Mr. Liddy was left in the office with a guard posted at the door to prevent him from leaving. After some time, other agents, led by an HHS OIG agent, began a second round of interrogation of Mr. Liddy regarding Medicare claims submitted by Liddy's pharmacy. Ms. Liddy, who had concluded her interrogation session, was allowed limited freedom, including the ability to place and answer phone calls. After consulting with counsel, Ms. Liddy indicated to Mr. Liddy and the agents that Mr. Liddy's attorney had been contacted and advised that Mr. Liddy assert his Fifth Amendment Privilege, which he promptly did.

(*Id*. at 2-3.)  Liddy contends that the statements he made were the product of a custodial interrogation and were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) and its progeny, and are therefore inadmissible at trial.

### A. Custodial Interrogation

The Fifth Amendment provides that a defendant cannot be "compelled in any criminal case to be a witness against himself."  CONST. AMEND. V.  The Supreme Court's decision, in *Miranda v. Arizona*, 384 U.S. 436 (1966), requires that a defendant must be warned that he has the right to remain silent, and that anything he says can be used against him in a court of law, when he is taken into custody and subjected to questioning.  A defendant must also be told that he has the right to the presence of an attorney, and if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  *Id*.   This requirement is necessary "[i]n order to encourage compliance with this rule, incriminating statements elicited from suspects in custody cannot be admitted at trial unless the suspect was first advised of his or her Miranda rights." *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998) (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

-33-

*Miranda* warnings are required prior to custodial interrogation.  Custodial interrogation is defined as, "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444.  In *Salvo*, the Sixth Circuit noted that, "[i]n applying Supreme Court precedent to questions of whether a defendant was 'in custody' for Miranda purposes, the Courts of Appeals have relied on a totality of circumstances approach to determine 'how a reasonable man in the suspect's position would have understood the situation.'" *Salvo*, 133 F.3d at 948 (quoting *United States v. Phillip*, 948 F.2d 241, 247 (6th Cir. 1991) (citations omitted)).  In applying the totality of the circumstances test, the factors that courts have relied upon include:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*Id*. at 950.  A reviewing court determines whether or not a defendant is in custody by "considering the 'objective circumstances of the interrogation,' rather than the 'subjective views harbored by either the interrogating officers or the person being questioned.'" *Id*.

### B. Analysis

The court hereby grants a hearing on the Motion because the court believes that the evidence from Liddy could amount to a Fifth Amendment violation.  He indicates he was isolated from others, was not allowed to leave the building, was not allowed to leave the room, never told he did not have to talk, and never told he was free to leave.  Furthermore, the document he puts forth referring to the search, DEA's Report of Investigation, says the interview was pursuant to the

execution of the search warrant, and that agents were there to get information.  (ECF No. 324-1.) In addition, Liddy asserts that they were told that they could not leave until they were questioned. Since the pharmacy was his establishment, he had every reason to believe he was the focus of the investigation.  Therefore, the court finds a hearing is necessary to determine whether Liddy's Fifth Amendment rights were violated and suppression of his statements is required.

## VII. LIDDY'S MOTION TO EXCLUDE 404(b) EVIDENCE & REQUEST FOR EVIDENTIARY HEARING

Defendant Liddy moves the court to exclude evidence related to other acts or alleged, uncharged crimes because he contends this evidence is barred by FED. R. EVID. 401, 403, 404(b) and by the Fifth Amendment.  (ECF No. 325).  Liddy argues that evidence regarding his pharmacy's interactions with other entities, Express Relief Services and Medical Express Services is irrelevant, unduly prejudicial or not proper 404(b) evidence.  Liddy maintains this motion is being made now to preserve his objections to the 404(b) materials.  Liddy acknowledges that the Government has yet to provide formal notice of the specific evidentiary items or testimony it intends to use as 404(b) evidence.

The Government contends that at this stage of the proceedings it is not obligated to "identify or list its trial exhibits, nor is it required to articulate either the relevance of any such potential evidence or the theory or rule under which it is admissible."  (Resp. at 2, ECF No. 337.)  The Government maintains it has fully complied with its discovery obligations under Rule 16, and will provide Defendant with reasonable notice in advance of trial if it intends to use any 404(b) evidence, and Defendant can challenge that evidence at that time.  However, the Government asserts that excluding any such evidence at this time is premature.

-35-

The court finds the Government's arguments well-taken.  Rule 404(b) of the Federal Rules of Evidence states:

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

The Government is not required to indicate what 404(b) evidence it intends to use at trial at this time.  It must only provide "reasonable notice in advance of trial."  The Government has plenty of time to comply with this requirement. Until such disclosures are actually made, the Defendant cannot challenge 404(b) evidence.  Resolving speculative arguments regarding what evidence may be presented as 404(b) evidence would be an inefficient use of the court's resources.   These resources would be better spent on ruling on arguments the Defendant wishes to make once the Government has provided notice of which evidence it intends to offer as 404(b) evidence. Therefore, Defendant's Motion is hereby dismissed.  Defendant may reassert his Motion once the Government has provided notice of any 404(b) evidence it intends to present.

## VIII. DARJI AND SASAKI'S 404(b) MOTIONS

Defendant Darji seeks the disclosure of evidence that the Government intends to introduce as FED. R. EVID. 404(b) evidence and additional time to file any motions *in limine*.  (ECF No. 348.) Defendant Sasaki requests that the court set a date by which the Government must disclose any evidence it intends to introduce as FED. R. EVID. 404(b) evidence and allow him additional time to file any motions *in limine*.  (ECF No. 350.)  As stated above, the Government is not required, at this

time, to indicate which evidence it intends to use as FED. R. EVID. 404(b) evidence, it must only provide "reasonable notice in advance of trial."  At this time, the court has not set a deadline for motions *in limine* to be filed, as the trial preparation schedule has not yet been set.  Defendants fail to provide any support for their claims that they are entitled to this evidence at this time.  The Government has indicated it will provide the requisite notice for any evidence it intends to offer as 404(b) evidence.  Defendants will then have an opportunity to file any motions *in limine* at that time.  As the Government has no obligation at this time, both of Defendant's Motions are denied.

### IX. KANN'S MOTION FOR DISCLOSURE OF IMPEACHING INFORMATION

Defendant Kann moves the court for an order requiring the Government to investigate and disclose all impeaching information and evidence within its possession.  (ECF No. 346.)  Specifically, Kann seeks the following:

> 1. Any and all consideration of promises, or consideration given to, or made on behalf of, a government's witness which could arguably create an interest, or bias in the witness in favor of the government, or against the defense, or acts as an inducement to testify, or to color testimony;
>
> 2. Any and all prosecution, investigation, or possible prosecutions pending, or prosecutions which could be brought against any witness and any probationary, parole or deferred prosecution status of the witness;
>
> 3. Any and all records and information revealing felony convictions attributed to any named witness;
>
> 4. Any and all records and information showing prior misconduct, or bad acts committed by any witness.
>
> 5. Any and all personnel files concerning witnesses.

(*Id*. at 2.)  Kann contends due process requires the Government to disclose evidence favorable to her, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  Kann argues that the Government has an

affirmative duty to disclose any and all consideration it has offered witnesses, as well as to provide information on witnesses that goes to the credibility of witnesses, pursuant to *Giglio v. United States*, 405 U.S. 150 (1972).  Kann maintains that this information must include things such as "the making of promises, including unwritten, or tacit promises and understandings, or the hold out of other inducements of a witness to cooperate and testify against the accused." (Mot. at 3.)  Kann also asserts that she is entitled to personnel files of a government employee if he/she serves as a witness for the Government.

The Government argues that Kann is not entitled to any of the information she has requested. The Government contends that Kann has no pretrial remedy under *Brady*.  The Sixth Circuit has stated that *Brady* was never intended to create pretrial remedies.  *See United States v. Moore*, 439 F.2d 1107, 1108 (6th Cir. 1971); *see also United States v. Short*, 671 F.2d 178, 187 (6th Cir. 1982). *Brady* offers defendants a post-trial remedy, not a pretrial one.

The Government also argues that it is not obligated to produce any information requested pursuant to *Giglio,* at this time.  The Sixth Circuit has stated that evidence used solely for the impeachment of witnesses must be turned over to the defendant in time for it to be used on cross-examination at trial.  *United States v. Presser*, 844 F.2d 1275, 1283-84 (6th Cir. 1988).  In addition, defense counsel is not entitled to know the witnesses the Government will call prior to trial.  *United States v. Dark*, 597 F.2d 1097, 1099 (6th Cir. 1979).  Further, in regard to Kann's claims that she needs to be informed of any consideration it has offered to witnesses to induce them to cooperate and testify against her, the Supreme Court has held that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *United States v. Ruiz*, 536 U.S. 622, 633 (2002).  The Government also argues

that Kann is not entitled to any sort of review of personnel files of agents, not even an *in camera* inspection, as she has failed to demonstrate a sufficient reason to believe such files contain material information.  *See United States v. Driscoll*, 970 F.2d 1472, 1482 (6th Cir. 1992) (rejecting defendant's argument that he was entitled to arresting officers' personnel files because he failed to offer any support for his contention that personnel files might contain information important to his case), *abrogated on other grounds by Hampton v. United States.*, 191 F.3d 695 (6th Cir. 1999).

The court finds the Government's arguments to be well-taken.  Kann is not entitled to the requested information under *Brady*.  Kann is not entitled to the requested information under *Giglio* at this time, because the Government is obligated to provide impeaching information in time for it to be used on cross-examination at trial.  The Government states that it is aware of this obligation and will comply with it in due course.  Kann has failed to provide any support to demonstrate that she is entitled at this time to any other information she has requested.  Therefore, Kann's Motion is denied in its entirety.

## X.  CONCLUSION

For the foregoing reasons, the court denies the following Motions: Darji's Motion to Preclude Direct and Derivative Use of Any Telephone Calls Involving Mr. Darji Intercepted Over Target Telephone Number 813-810-7268 (ECF No. 258), Defendant Darji's Motion to Suppress His Conversations on the Hazelwood Wiretap Based on Lack of Individualized Necessity (ECF No. 266), Darji's Motion for *Franks*' Hearing to Suppress Darji's Conversations Recorded Pursuant to Court-Ordered Wiretaps on Cell Phone Number 404-694-9560 (ECF No. 267), Darji's Motion for a *Franks*' Hearing to Suppress Materials Seized Pursuant to Search Warrants (ECF No. 268), Hazelwood's Motion for Notice of the Government's Intention to Offer into Evidence Unlawfully

Seized E-mail and to Suppress (ECF No. 323), Hazelwood's Motion for Notice of the Government's Intention to Offer into Evidence Material Seized From Hazelwood's Residence (ECF No. 327), Liddy's Motion to Exclude 404(b) Evidence & Request for Evidentiary Hearing (ECF No. 325), Darji's Motion for Disclosure of Evidence That the Government Intends to Introduce Pursuant to F.R.E. 404(b) (ECF No. 348), Sasaki's Motion for Court to Set a Date by Which the Government Must Disclose Evidence They Intend to Introduce Pursuant to F.R.E. 404(b) (ECF No. 350), and Kann's Motion for Disclosure of Impeaching Information (ECF No. 346).  The court grants Liddy's Motion to Suppress Statement & Request for Evidentiary Hearing (ECF No. 324) and sets a hearing for July 27, 2011, at 9:00 a.m.

IT IS SO ORDERED.

/s/*SOLOMON OLIVER, JR.*
CHIEF JUDGE
UNITED STATES DISTRICT COURT

June 28, 2011

-40-

**Appendix A**

| ECF No. | Motion | Joined in By? |
|---|---|---|
| 258 | Darji's Motion to Preclude Direct and Derivative Use of Any Telephone Calls Involving Mr. Darji Intercepted Over Target Telephone Number 813-810-7268 | Hazelwood |
| 266 | Darji's Motion to Suppress His Conversations on the Hazelwood Wiretap Based on Lack of Individualized Necessity | Derks, Sasaki |
| 267 | Darji's Motion for *Franks*' Hearing to Suppress Darji's Conversations Recorded Pursuant to Court-Ordered Wiretaps on Cell Phone Number 404-694-9560 | Derks, Sasaki |
| 268 | Darji's Motion for a *Franks*' Hearing to Suppress Materials Seized Pursuant to Search Warrants | Derks, Sasaki |
| 323 | Defendant Hazelwood's Motion for Notice of the Government's Intent to Offer into Evidence Unlawfully Seized E-mail and to Suppress | |
| 324 | Liddy's Motion to Suppress Statement & Request for Evidentiary Hearing | |
| 325 | Liddy's Motion to Exclude 404(b) Evidence & Request for Evidentiary Hearing, | |
| 327 | Hazelwood's Motion for Notice of the Government's Intention to Offer into Evidence Material Seized From Hazelwood's Residence | |
| 346 | Kann's Motion for Disclosure of Impeaching Information | |
| 348 | Darji's Motion for Disclosure of Evidence That the Government Intends to Introduce Pursuant to F.R.E. 404(b) | |
| 350 | Sasaki's Motion for Court to Set a Date by Which the Government Must Disclose Evidence They Intend to Introduce Pursuant to F.R.E. 404(b) | |